Thomas S. Carter, Esq. (SBN 256876)
**THE LAW OFFICES OF THOMAS S. CARTER**
223 W Foothill Blvd, Second Floor
Claremont, CA 91711-2757
Tel: 909.296.3360
Fax: 909.697.4444
tom@tscarterlaw.com

Attorney for Plaintiff:
SILVER SCREEN FILMS INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SILVER SCREEN FILMS INC. (formerly Silver Screen Finance, Inc.), a Cayman Islands Company, registered as a foreign corporation in California; <br><br> Plaintiff, <br> vs. <br><br> HOLLYWOOD MEDIA VENTURE, LLC, a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURES I, LLC, a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURES II, LLC, a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURES HOLDINGS, LLC, a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURES HOLDINGS II, LLC, a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURES MANAGEMENT, LLC, a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURE PARTNERS, LLC a Delaware Limited Liability Company; HOLLYWOOD MEDIA VENTURE | **Case No.:** <br><br> **PLAINTIFF'S COMPLAINT FOR:** <br><br> **1) Breach of Written Contract (1);** <br> **2) Breach of Written Contract (2);** <br> **3) Breach of Written Contract (3);** <br> **4) Breach of Fiduciary Duty;** <br> **5) Fraudulent Inducement;** <br> **6) Intentional Misrepresentation;** <br> **7) Negligent Misrepresentation;** <br> **8) Concealment;** <br> **9) Conversion;** <br> **10) Account Stated;** <br> **11) Civil RICO (18 U.S.C. §1962(c));** <br> **12) Civil RICO Conspiracy (18 U.S.C. §1962(d));** <br> **13) Fraudulent Transfer (CA Civil Code §3439 et seq.)** <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

PRODUCTIONS I, LLC a Delaware )
Limited Liability Company; )
PRODUCTION CAPITAL, LLC; a )
Delaware Limited Liability Company; )
PRODUCTION CAPITAL CORP., a )
California corporation; BURGEE & )
ABRAMOFF, PROFESSIONAL )
CORPORATION, a California Professional )
Corporation; KNIGHTSBRIDGE )
ENTERTAINMENT, INC., a Colorado )
Corporation; BASE FX PRODUCTIONS )
SWITZERLAND AG; a Baar, Switzerland, )
public limited company; KEVIN ROBL, an )
individual; REMINGTON WILLIAM )
CHASE, aka Bill Chase aka William )
Westwood, aka William Elliot, an )
individual; ROBERT WILLIAM )
ABRAMOFF, ESQ., an individual; )
MOHAMED SHAABAN, an individual; )
and DOES 1-20, inclusive, )
                                                                )
                                    Defendants. )
_____)

Plaintiff SILVER SCREEN FILMS INC. (formerly Silver Screen Finance, Inc.) (hereinafter, "SSF") ("Plaintiff") complains against Defendants HOLLYWOOD MEDIA VENTURE, LLC ("HMV"); HOLLYWOOD MEDIA VENTURES I, LLC ("HMV I"); HOLLYWOOD MEDIA VENTURES II, LLC ("HMV II"); HOLLYWOOD MEDIA VENTURES HOLDINGS, LLC ("HMV Holdings"); HOLLYWOOD MEDIA VENTURES HOLDINGS II, LLC ("HMV Holdings II"); HOLLYWOOD MEDIA VENTURES MANAGEMENT, LLC ("HMV Management"); HOLLYWOOD MEDIA VENTURES PARTNERS, LLC, (hereinafter, "HMV Partners"); HOLLYWOOD MEDIA VENTURE PRODUCTIONS I, LLC ("HMV Productions") (collectively referred to as "HMV Related Entities"); PRODUCTION CAPITAL, LLC ("Production Capital"); PRODUCTION CAPITAL CORP., a California corporation; BURGEE &

ABRAMOFF, PROFESSIONAL CORPORATION ("Abramoff Firm"); KNIGHTSBRIDGE ENTERTAINMENT, INC. ("Knightsbridge"); BASE FX PRODUCTIONS SWITZERLAND AG ("Base Swiss"); KEVIN ROBL ("Robl"); REMINGTON WILLIAM CHASE, aka William Westwood, aka William Elliot ("Chase"); ROBERT WILLIAM ABRAMOFF, ESQ., an individual ("Robert Abramoff"); MOHAMED SHAABAN ("Shaaban"), an individual (collectively, "Defendants") as follows:

## NATURE OF THE CASE

1. Between 2019 and 2021, Robl, Production Capital, and Hollywood Media Venture, LLC ("HMV"), along with the assistance of Chase, used a fraudulent movie financing scheme to swindle SSF out of approximately $6,516,250. As part of the scheme, Robl created a myriad of corporate entities (the HMV Related Entities), many of which were simple derivations of the name Production Capital and HMV to abscond with the money SSF provided to Defendants.

2. Robl, Production Capital, HMV, and Chase targeted SSF and other investors by purporting to offer them opportunities to participate in the financing of film productions. However, the investments were fake, and the funds were used for other purposes, including to pay other creditors, and for Robl, Production Capital, HMV, HMV Related Entities, and Chase's personal and corporate expenses. Defendant Robert Abramoff and Abramoff Firm aided Robl, Production Capital, HMV, HMV Related Entities, and Chase accomplish the scam by allowing them to use its client trust account (the "Abramoff Account") for the deposit of SSF's money, and improperly allowing the transfer of SSF's money into a Production Capital bank account (and the various other related corporate entities), where it was never returned to SSF.

3. Between 2019 and 2021, Robl, Production Capital, HMV, and Chase solicited financing loans from SSF, while misrepresenting that Production Capital and HMV were providing short-term financing solutions for companies in the film production industry. Robl, Production Capital, HMV, and Chase represented that the SSF's

**COMPLAINT**

investment funds would be used to finance certain film projects, and that SSF would be paid its principal investment, plus interest, after certain defined time periods. This was false and did not occur.

4.      In and around 2019, SSF initially liaised with Chase, who was a close personal and business associate with Robl, arranging to have SSF enter into various loan agreements with 10-13 Productions, Inc., and a promissory note with Chase. SSF later liaised with Robl and entered into a bridge loan with Production Capital in and around September 21, 2021, in an attempt to obtain repayment of the aforementioned loans. The exact detail of these three (3) initial loans is more fully explained in the later section, which provides the general allegations common to all causes of action.

5.      After the loans came due and remained unpaid, and multiple attempts throughout 2020 and 2021 at repayment from Chase and his counsel Robert Abramoff, in and around December 19, 2021, SSF entered into three (3) Assignment and Assumption Agreements with HMV ("Assignment Agreements"), assigning the three (3) underlying loan agreements noted above in order to obtain full repayment to SSF.

6.      These were short term loans to be repaid within a ten (10) day period. The exact detail of the three (3) Assignment Agreements is more fully explained in the later section containing the general allegations common to all causes of action and specifically entitled, "**Assignment and Assumption Agreements**." After various attempts at retrieving the loaned money from Robl, Production Capital, HMV, Chase, Robert Abramoff, and Abramoff Firm, SSF resorted to legal intervention.

7.      The Defendants engaged in ongoing and coordinated fraudulent conduct and concealment that constituted a conspiratorial scheme in violation of Civil RICO Conspiracy (18 U.S.C. §1962(d)). Defendants used the funds recruited from new investors including SSF to pay principal and interest to its existing investors, creditors, and/or to pay unrelated third parties, business expenses, and personal expenditures or benefits. Such undisclosed use of funds constitutes a conspiratorial scheme.

8.     Additionally, Robl was a member of the board of directors for Base Swiss from in and around May 9, 2019, until in and around March 26, 2021, along with Shaaban who the President of the Board of Directors from Base Swiss's incorporation on or about April 30, 2019, until the present. SSF is informed and believes that Robl, Production Capital, HMV, HMV Related Entities, Shaaban, and Chase utilized Base Swiss to fraudulently transfer funds and purchase real property in order to evade repayment of the various loans owed to SSF. Shaaban, as President of the Board of Directors, was aware of or should have been aware of Base Swiss being used to funnel fraudulent funds owed to SSF. Upon information and belief, Base Swiss transacted upwards of $2,500,000, through various banking institutions, which included the money owed to SSF.

9.     To that end, there is current litigation from other defrauded investors who fell victim to a similar conspiratorial scheme. On January 24, 2022, a group of victims including ALTAA Investment, a Delaware Limited Liability Company; 18150 Tiger LLC, a Delaware Limited Liability Company; and Pacific Venture Partners LLC, a Delaware Limited Liability Company filed a RICO lawsuit against Defendants Robl, Production Capital, Abramoff Firm, other individuals and related entities to Robl and Chase in the Central District of California, Case 2:22-cv-00498-JFW-MAA.

10.     There is a pending action in Central District of California includes Case 2:22-cv-01954 filed on March 24, 2022, wherein Plaintiff Base Media Technology Group Limited, a Hong Kong plaintiff allege similar claims against Robl; Production Capital; Friends of Production Capital, LLC, a Delaware Limited Liability Company; Chase; and other related entities and individuals.

11.     There is a pending action in Superior Court of the State of California for the County of Orange include Case 30-2022-012403056-CU-FR-NJC filed on January 28, 2022, wherein Plaintiff Na Wu, Guowen Liu, and Xiaofang Yi allege similar claims against Robl, Production Capital, Chase; and other related entities and individuals.

12.     There is a pending action in Superior Court of the State of California for the County of Los Angeles include Case 22STCV15723 filed on May 11, 2022, wherein

Plaintiff Joseph Tang alleges similar claims against Robl, Production Capital, Chase, Abramoff Firm, and other related entities and individuals.

13. There is a pending action in Central District of California includes Case 2:22-cv-07265-SPG-SK filed on October 5, 2022 wherein Plaintiffs Cambridge Sarnano, LLC, a Wyoming limited liability company allege similar claims against Robl; Production Capital; Chase; and other related entities and individuals.

## THE PARTIES

14. Plaintiff SILVER SCREEN FILMS INC. (formerly Silver Screen Finance, Inc.) (hereinafter, "SSF") is a Cayman Islands Corporation, registered as a foreign corporation in California.

15. Defendant HOLLYWOOD MEDIA VENTURE, LLC, (hereinafter, "HMV") is a Delaware Limited Liability Company, that regularly conducts business in the County of Los Angeles, California.

16. Defendant HOLLYWOOD MEDIA VENTURES I, LLC, (hereinafter, "HMV I") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

17. Defendant HOLLYWOOD MEDIA VENTURES II, LLC, (hereinafter, "HMV II") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

18. Defendant HOLLYWOOD MEDIA VENTURES HOLDINGS, LLC, (hereinafter, "HMV Holdings") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

19. Defendant HOLLYWOOD MEDIA VENTURES HOLDINGS II, LLC, (hereinafter, "HMV Holdings II") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

**COMPLAINT**

20.     Defendant HOLLYWOOD MEDIA VENTURES MANAGEMENT, LLC, (hereinafter, "HMV Management") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

21.     Defendant HOLLYWOOD MEDIA VENTURES PARTNERS, LLC, (hereinafter, "HMV Partners") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

22.     Defendant HOLLYWOOD MEDIA VENTURES PRODUCTIONS I, LLC, (hereinafter, "HMV Productions") is a Delaware Limited Liability Company, that on information and belief, regularly conducts business in the County of Los Angeles, California.

23.     Defendant PRODUCTION CAPITAL, LLC (hereinafter, "Production Capital") is a Delaware Limited Liability Company, that regularly conducts business in the County of Los Angeles, California.

24.     Defendant PRODUCTION CAPITAL, CORP. (hereinafter, "Production Capital Corp.") is a California corporation, that regularly conducts business in the County of Los Angeles, California.

25.     Defendant BURGEE & ABRAMOFF, PROFESSIONAL CORPORATION (hereinafter, "Abramoff Firm") is a California Professional Corporation, that regularly conducts business in the County of Los Angeles, California. Its principals are John Gerard Burgee, Esq. and Robert William Abramoff, Esq.

26.     Defendant KNIGHTSBRIDGE ENTERTAINMENT, INC. (hereinafter, "Knightsbridge") is a Colorado Corporation that regularly conducts business in the County of Los Angeles, California.

27.     Defendant BASE FX PRODUCTIONS SWITZERLAND AG (hereinafter, "Base Swiss") is a Baar, Switzerland, public limited company that on information and belief, regularly conducts business in the County of Los Angles, California.

7

**COMPLAINT**

28.     Defendant KEVIN ROBL (hereinafter, "Robl") is an individual residing in the County of Los Angeles, California. Robl is Production Capital's co-founder and current Chief Executive Officer. Robl controls and is the principal of HMV and the HMV Related Entities. He was a member of the board of directors of Base Swiss.

29.     Defendant REMINGTON WILLIAM CHASE, aka Bill Chase aka William Westwood, aka William Elliot (hereinafter, "Chase") is an individual residing in the County of Los Angeles, California. Chase is Robl's close personal and business associate. Chase controls and is the principal of Knightsbridge.

30.     Defendant ROBERT WILLIAM ABRAMOFF, ESQ. (hereinafter, "Robert Abramoff") is an individual and California licensed attorney No.: 138439 who regularly conducts business in the County of Los Angeles, California. He is one of the principals of the Abramoff Firm.

31.     Defendant MOHAMED SHAABAN (hereinafter, "Shaaban") is an individual who upon information and belief resides in Zug, Switzerland and regularly conducts business in the County of Los Angeles, California. Shaaban is the current President of the Board of Directors for Base Swiss.

32.     At all times mentioned herein, each of the Defendants are and were the agent, servant, partner, employee, and/or joint venture of one or more of each of the other Defendants and was acting within the purpose, course, and scope of such agency, service, employment, partnership or joint venture with the consent of and/or ratification by one or more co-Defendants.

33.     SSF is informed and believes, and based thereon alleges, that Robl; Production Capital; Production Capital Corp.; HMV; HMV I, HMV II, HMV Holdings, HMV Holdings II, HMV Management, HMV Partners, and HMV Productions (collectively, the "HMV Related Entities"); and Base Swiss constitute a single enterprise. Adherence to the fiction of the separate existence of the aforementioned entities in this case as distinct entities would permit an abuse of the corporate privilege and would promote injustice in that a sufficient unity of interests, control, and ownership exists

between Robl, Production Capital, Production Capital Corp., HMV, HMV Related Entities, and Base Swiss such that any separateness between them has ceased to exist.

34.     SSF is further informed and believes, and based thereon alleges, Robl, Production Capital, Production Capital Corp., HMV, HMV Related Entities, and Base Swiss are the alter egos of each other, in that they exercise dominion and control over each other, commingle funds, treat each other's assets as their own, pay each other's debts, fail to respect corporate formalities such as the maintenance of adequate corporate records, and keep their true ownership and control concealed from third parties like SSF. Adherence to the fiction of the separate existence of the aforementioned entities in this case as distinct entities would permit an abuse of the corporate privilege and would promote injustice in that a sufficient unity of interests, control, and ownership exists between Robl, Production Capital, Production Capital Corp., HMV, HMV Related Entities, and Base Swiss such that any separateness between them has ceased to exist.

35.     SSF is further informed and believes, and based thereon alleges, that Knightsbridge and Chase are the alter-ego of one another, in that Chase exercises dominion and control over Knightsbridge, commingles funds, treats its assets as his own, pays his personal debts, fails to respect corporate formalities, such as the maintenance of adequate corporate records, and keeps the true ownership and control concealed from third parties like SSF. Adherence to the fiction of the separate existence of Knightsbridge in this case as distinct entity would permit an abuse of the corporate privilege and would promote injustice in that a sufficient unity of interests and ownership exists between Chase and Knightsbridge such that any separateness between them has ceased to exist.

36.     The true names and capacities of DOES 1 through 20 are unknown to SSF, who therefore sues them by such fictitious names. SSF will amend to show their true names and capacities when ascertained. SSF is informed and believes that each of DOES 1 through 20 is in some manner responsible for the acts herein alleged.

//

//

## JURISDICTION AND VENUE

37.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under the laws of the United States.

38.     Jurisdiction is also proper because each of the individual Defendants resides in this judicial district, and each corporate Defendant regularly conducts business in this judicial district. Defendants have also subjected themselves to the jurisdiction of this Court by virtue of their contracts with SSF and have otherwise regularly conducted business with this state, sufficient for this Court to exercise jurisdiction over them.

39.     To the extent original jurisdiction does not otherwise exist over any claims in this lawsuit, this Court has supplemental jurisdiction over such claims under 28 U.S.C. § 1367 as they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

40.     Venue is proper, under 28 U.S.C. section 1391(b), because the events giving rise to the allegations in this Complaint occurred in this district.

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

41.     As noted in The Nature of the Case, the conspiratorial scheme to defraud SSF began in and around July 2019, with a shareholder of SSF (hereinafter, "SSF Shareholder") liaising with Chase by way of email. Chase, who was working in concert with Robl, induced SSF and SSF Shareholder to provide film financing loans and a personal loan to Chase. The initial promise was that these loans would result in funding for various films and earn returns on those loans/investments.

42.     In truth, Chase and Robl used HMV, HMV Related Entities, Production Capital, and Base Swiss, which were mere shams, to abscond with upwards of $6,516,250 from SSF through the additional assistance of Robert Abramoff, the Abramoff Firm, and Shaaban. Defendants accomplished the theft through the underlying fraudulent loans, which are more fully described below. After those loans came due and went unpaid, SSF reasonably relied upon Defendants' further false claims of additional capital being

**COMPLAINT**

accessed from a New York investment fund that would lead to full repayment of the underlying loans.

43.     These further lies induced SSF to enter into three (3) assignment and assumption agreements through which SSF would obtain full repayment and interest from the various loans provided to Chase, Robl, HMV, and Production Capital. None of this was true, nor did any repayment occur.

**Relevant Facts on Underlying Agreements and Loans**

The 10-13 Productions, Inc. Financing Agreements ("10-13 Loan")

44.     By way of emails between SSF Shareholder and Chase, in around July 2019 to September 2019, Chase arranged for SSF to provide a financing loan to 10-13, which was producing a film under the same name. On July 21, 2019, Chase emailed SSF with an alleged script and document purporting to list the involvement of Nicholas Cage, Marisa Tomei, Famke Janssen, and Mekhi Phifer with a start date of August 19, 2019. Further details of the film financing were provided in a July 30, 2019, email between the parties.

45.     In and around September 2, 2019, SSF (under its former name Silver Screen Finance, Inc.) entered into a Loan Agreement ("10-13 Loan") with 10-13 Productions, Inc. ("10-13 Productions"). The 10-13 Loan was for $3,100,000 and would be used solely to remain on deposit for 10-13 Productions within its bank account. Upon issuance of a completion guaranty for the film, also referred to as "10-13," 10-13 Productions would repay the loan with flat interest equal to 25% of the 10-13 Loan ($775,000) for a total of $3,875,000. Should the completion guaranty for the film not be issued on or before September 9, 2019, 10-13 Productions was required to repay the loan plus 5% flat interest ($155,000).

46.     The 10-13 Loan also contains clear terms that the loan proceeds remain on deposit and not to be used for any purpose other than repayment and not be commingled with any of 10-13 Productions' separate funds. Per the 10-13 Loan (Sections 1-4), the Abramoff Account would be holding a portion of SSF's funds, until repayment occurred.

47.     The 10-13 Loan also functioned to include previous amounts owed to SSF from Production Capital to pay-off monies owed to SSF through reinvestment in the 10-13 Loan, and money targeted to be put into BFIL Limited, which as previously known as Base FX International Limited, a related entity to SSF.

48.     SSF initially wired $1,500,000 to the Abramoff Account (10-13's legal counsel), on September 3, 2019. SSF then wired $1,600,000 directly to 10-13 Productions' bank account on September 5, 2019. These wires reflect the total $3,100,000 per the 10-13 Loan. True and correct copies of the 10-13 Loan and the corresponding September 3, 2019, and September 5, 2019, wires are attached hereto, as **Exhibit 1.**

Promissory Note to Chase ("Chase Note")

49.     SSF provided a personal loan by way of a November 21, 2019, Promissory Note to Chase in the amount of $700,000. The Chase Note carried a flat interest of $105,000 for a total owed to SSF of $805,000 and was due on December 24, 2019. SSF wired the $700,000 on November 27, 2019, to the Abramoff Account (Chase's legal counsel). True and correct copies of the Chase Note and the corresponding November 27, 2019, wire is attached hereto, as **Exhibit 2.**

Capital Advance Agreement ("CAA")

50.     SSF then entered into a Capital Advance Agreement ("CAA") on September 21, 2021, which would provide a bridge loan of $550,000 to Production Capital, communicating with Robl, and his assistant, Daniel Petta. The CAA allegedly would allow Production Capital to access a line of credit with Kennedy Lewis Investment Management (a hedge fund based in New York, hereinafter, "Kennedy Lewis") and release $25,000,000 to Hollywood Media Ventures I, LLC (a related entity to HMV). Production Capital or HMV would then wire $10,000,000 to SSF to pay down all previous advances and credits that SSF made to Production Capital and related entities. Further, Chase provided screen shots of an alleged $27,000,000 in an HMV bank account. SSF later learned that none of this was true and part of a fraudulent scheme.

**COMPLAINT**

51.     The parties memorialized the above in a September 23, 2021, email between SSF Shareholder, Petta, Robl, and Chase, providing further details on the breakdown of funding for SSF in a later September 30, 2021, email. The CAA would be repaid in six months from the date of execution with a five percent (5%) premium for a total of $577,500. On or about September 29, 2021, SSF wired $550,000 to Production Capital pursuant to the CAA. True and correct copies of the CAA and the corresponding September 29, 2021, wire is attached hereto, as **Exhibit 3.**

52.     In summary, SSF provided wires of $1,600,000 to 10-13 Productions; $2,200,000 to the Abramoff Account (as part of the 10-13 Loan and Chase Note); and $550,000 to Production Capital for a total of $4,350,000.

**Assignment and Assumption Agreements**

53.     In anticipation of Kennedy Lewis allegedly funding HMV and HMV Related Entities, SSF and HMV entered into the three (3) Assignment Agreements on or about December 19, 2021.

54.     10-13 Assignment and Assumption Agreement ("10-13 Assignment"): The 10-13 Assignment was executed between SSF and HMV to assign all rights related to the underlying 10-13 Loan. Upon information and belief, 10-13 Productions is now dissolved. The 10-13 Assignment was in consideration of the principal amount of $3,100,000 plus 15% interest for a total owed of $4,019,925 by HMV within ten (10) days of execution. The parties executed the assignment agreement on or about December 19, 2021, making payment due on December 29, 2021. HMV never made payment on the 10-13 Assignment. A true and correct copy of the 10-13 Assignment is attached hereto as **Exhibit 4.**

55.     Chase Assignment and Assumption Agreement ("Chase Assignment"): The Chase Assignment was executed between SSF and HMV to assign all rights to the underlying promissory note provided to Chase on or about November 21, 2019. In consideration for SSF transferring the promissory note to HMV, the total owed to SSF was $1,010,625 ($700,000 plus 15%). HMV was to make payment within ten (10) days

**COMPLAINT**

after execution of the Chase Assignment. The parties executed the assignment agreement on or about December 19, 2021, making payment due on December 29, 2021. HMV never made payment on the Chase Assignment. A true and correct copy of the Chase Assignment is attached hereto as **Exhibit 5.**

56.     Production Capital Assignment and Assumption Agreement ("Production Capital Assignment"): The Production Capital Assignment was executed between SSF and HMV to assign all rights to the underlying CAA that was entered into on September 23, 2021, between SSF and Production Capital in the original amount of $550,000. The superseding Production Capital Assignment was in consideration of $577,500 ($550,000 plus 5%), and HMV was to pay SSF within ten (10) days of execution. The parties executed the assignment agreement on or about December 19, 2021, making payment due on December 29, 2021. HMV never made payment on the Production Capital Assignment. A true and correct copy of the Production Capital Assignment is attached hereto as **Exhibit 6.**

**Initial Attempts at Recoupment, Further Intent to Defraud**

57.     When the initial 10-13 Loan and Chase Note first became due, SSF began reaching out to Chase and Robert Abramoff. Robert Abramoff appears to acknowledge in a December 26, 2019, email that the Abramoff Account and his clients (Chase and 10-13) received approximately $500,000 and would be wiring that to SSF. This did not take place. SSF Shareholder then reached out to Robert Abramoff again in and around January 27, 2020, by way of email regarding the overdue loans and amounts that were directly wired to the Abramoff Account. Those amounts were a total of $2,200,000, which reflects the $700,000 wired for the Chase Note and the $1,500,000 wired as part of the 10-13 Loan.

58.     After the initial 10-13 Loan, Chase Note, and CAA had been assigned to HMV through the Assignment Agreements, HMV was allegedly the party that retained control over SSF's funds. In turn, after the Assignment Agreements came due in and around December 29, 2021, SSF Shareholder and Robl exchanged various messages through Robl's messaging system, "Signal." SSF Shareholder later learned that Robl had

set the messages to disappear after one (1) day. Robl intended to eliminate any record of his fraudulent statements regarding the Assignment Agreements and HMV actually repaying the amounts owed under each of the three (3) Assignment Agreements.

59.     A brief summary of the messages indicates that after executing the Assignment Agreements, SSF Shareholder messaged Robl on December 21, 2021, seeking repayment by the end of the week. Robl indicated that, "As U know, the reason we asked for 10 days was to make sure HMV would be able to get thru it's funding process. Thx." SSF Shareholder contacted Robl again on December 29, 2021, and Robl indicated:

> **Robl:**  Been trying to wrap here so I can call but still need to confirm with KL [Kennedy Lewis is funding the HMV account] tomorrow when we are disbursing. Will definitely happen by a Friday at latest. Are u in LA? If so let's meet up over next couple of days.

The parties planned to meet in person at Shakers Restaurant in Pasadena on December 30, 2021. Robl continued to mislead by misstating the wiring process:

> **Robl**: Friday to pc [Production Capital] so Monday to u guys…
> **SSF SHAREHOLDER**: Is KL sending to PC or HMV? If it's PC, we will have to have other paperwork. Bank will ask for contracts for Base FX Int'l and Silver Screen with PC before they allow us to use the funds. I know it's a hassle but that's the way the Bank works nowadays.
> **Robl**: No your correct. KL sending to HMV funding account. Friday, HMV sending direct to u Monday. I was driving and texting and said PC but it is HMV. Sorry

60.     On January 1, 2022, SSF Shareholder reached out to Robl to confirm if the funds had been sent from Kennedy Lewis (the hedge fund, funding HMV and HMV Related Entities). Robl indicated, "…HMV acct. funded. We will send payments Monday. Spending some family time. If I need to talk can we do it tomorrow?" This was false; nothing had been funded. SSF Shareholder tried various times to reach out to Robl, who did not respond until January 11, 2022, wherein Robl indicated his daughter was ill and would contact SSF Shareholder that day. This did not occur.

61.     SSF Shareholder communicated with Robl's assistant Daniel Petta on January 12, 2022, who indicated that Robl would get HMV funded and for SSF Shareholder to hold off on pursuing legal action, since Robl was dealing with his daughter who contracted Covid-19. Later that day, Robl confirmed with SSF Shareholder what Petta provided.

62.     On January 14, 2022, Robl messaged SSF Shareholder, "Confirmed HMV funds finally going out Tuesday. Sorry I have not had my eye on the ball but Ana feeling better so pushing all now. Thx." This did not occur. On January 21, 2022, the parties exchanged the following:

> **SSF SHAREHOLDER**: Looks like wires never went out. We will have to pursue alternate plans.
> **Robl**: HMV should get them out today.  As u know there is not a viable "alternative plan" where we all get paid. The alternative is just a mess so pls help everyone to be patient while we get these done. Let's speak later today when I should have definitive answer regarding wires. Thx

63.     SSF Shareholder attempted to reach Robl by phone, but to no avail. On January 23, 2021, SSF Shareholder was en route to meet Robl in person at Shakers restaurant in South Pasadena when Robl indicated that he would not be able to attend the meeting. SSF Shareholder indicated that he had no other choice than to initiate legal proceedings given that a month had elapsed since the deadline for payment. Robl indicated he would call later and then ceased communications with SSF Shareholder.

## FIRST CAUSE OF ACTION – Breach of Written Contract (1): 10-13 Assignment

### (Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, and Robl and DOES 1-20, inclusive)

64.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

65.     There exists a written contract between SSF and HMV by virtue of the 10-13 Assignment entered into on or about December 19, 2021. *See* **Ex. 4**. Robl, Production Capital, and HMV Related Entities are liable as the alter-egos of each other. Furthermore,

HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, and Robl function as a single enterprise. Defendants owe SSF $4,019,925 under the 10-13 Assignment, which came due on December 29, 2021.

66.     Neither the whole nor any part of the above-referenced sum has been paid, although demand has been made, and there is now due and owing to SSF on account thereof a sum of not less than $4,019,925 with interest thereon at the maximum rate allowed by law.

67.     SSF has performed substantially under the agreement or has been excused from performance due to the breaches by Defendants.

68.     Defendants breached the agreement by failing to pay the balance due and owing under the agreement within ten (10) days of its execution in an amount not less than $4,019,925, in spite of repeated demands from SSF.

69.     As a result of the foregoing breach, Defendants did cause damage to SSF as a direct and proximate result of the breach by failing to pay the amount due and owing in the amount of not less than $4,019,925 plus prejudgment interest accrued since December 29, 2021, the date of the breach.

## SECOND CAUSE OF ACTION – Breach of Written Contract (2): Chase Assignment

### (Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, and Robl and DOES 1-20, inclusive)

70.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

71.     There exists a written contract between SSF and HMV by virtue of the Chase Assignment entered into on or about December 19, 2021. *See* **Ex. 5**. Robl, HMV, HMV Related Entities, Production Capital, Production Capital Corp., and Base Swiss are liable as the alter-egos of each other. Furthermore, HMV, Production Capital, Production Capital Corp., HMV Related Entities, Base Swiss, and Robl function as a single enterprise.

Defendants owe SSF $1,010,625 under the Chase Assignment, which came due on December 29, 2021.

72.     Neither the whole nor any part of the above-referenced sum has been paid, although demand has been made, and there is now due and owing to SSF on account thereof a sum of not less than $1,010,625 with interest thereon at the maximum rate allowed by law.

73.     SSF has performed substantially under the agreement or has been excused from performance due to the breaches by Defendants.

74.     Defendants breached the agreement by failing to pay the balance due and owing under the agreement within ten (10) days of its execution in an amount not less than $1,010,625, in spite of repeated demands from SSF.

75.     As a result of the foregoing breach, Defendants did cause damage to SSF as a direct and proximate result of the breach by failing to pay the amount due and owing in the amount of not less than $1,010,625 plus prejudgment interest accrued since December 29, 2021, the date of the breach.

## THIRD CAUSE OF ACTION – Breach of Written Contract (3): Production Capital Assignment

### (Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, and Robl and DOES 1-20, inclusive)

76.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

77.     There exists a written contract between SSF and HMV by virtue of the Production Capital Assignment entered into on or about December 19, 2021. *See* **Ex. 6**. Robl, Production Capital, Production Capital Corp., HMV Related Entities, and Base Swiss are liable as the alter-egos of each other. Furthermore, HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, and Robl function as a single enterprise. Defendants owe SSF $577,500 under the Production Capital Assignment, which came due on December 29, 2021.

**COMPLAINT**

78.    Neither the whole nor any part of the above-referenced sum has been paid, although demand has been made, and there is now due and owing to SSF on account thereof a sum of not less than $577,500 with interest thereon at the maximum rate allowed by law.

79.    SSF has performed substantially under the agreement or has been excused from performance due to the breaches by Defendants.

80.    Defendants breached the agreement by failing to pay the balance due and owing under the agreement within ten (10) days of its execution in an amount not less than $577,500, in spite of repeated demands from SSF.

81.    As a result of the foregoing breach, Defendants did cause damage to SSF as a direct and proximate result of the breach by failing to pay the amount due and owing in the amount of not less than $577,500 plus prejudgment interest accrued since December 29, 2021, the date of the breach.

## FOURTH CAUSE OF ACTION – Breach of Fiduciary Duty

**(Against the Abramoff Firm, Robert Abramoff, and DOES 1-20, inclusive)**

82.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

83.    The Abramoff Firm and its principal, Robert Abramoff, owed SSF a fiduciary duty by virtue of its agreement to hold SSF's funds in the Abramoff Account under the Chase Note, 10-13 Loan, and the corresponding wires. The amounts wired to the Abramoff Account totaled $2,200,000, which reflects the $700,000 wired for the Chase Note and the $1,500,000 wired as part of the 10-13 Loan. *See*, **Ex. 1,** Sections 1-4, September 3, 2019, wire; *See also*, **Ex. 2**, November 27, 2019, wire.

84.    By acting as a fiduciary, the Abramoff Firm and Robert Abramoff owed a duty to SSF to be diligent in maintaining the Abramoff Account, and to ensure that the 10-13 Loan and Chase Note funds remained in the Abramoff Account as required by the agreements. This duty persisted, and funds were also to remain in the Abramoff Account to effectuate the 10-13 Assignment and Chase Assignment agreements.

85.     The Abramoff Firm and Robert Abramoff were aware that the funds were removed from the Abramoff Account, acknowledging as such to SSF through the repayment emails between SSF Shareholder and Robert Abramoff in and around December 26, 2019, and January 27, 2020. The funds could not have been withdrawn from the Abramoff Account without the Abramoff Firm and Robert Abramoff's authority and involvement. Nevertheless, the Abramoff Firm and Robert Abramoff failed to sufficiently act to prevent the investment funds from being moved out of the Abramoff Account. This constituted a breach of the Abramoff Firm and Robert Abramoff's duty to SSF.

86.     The Abramoff Firm and Robert Abramoff's breach of its duty to oversee the Abramoff Account and ensure that the funds remained in the account was a direct and proximate cause of SSF's injuries. But for the Abramoff Firm and Robert Abramoff's breach, SSF's funds would remain in the Abramoff Account and would be able to be returned.

87.     As a direct and proximate result of this breach, SSF has been damaged in a total amount of not less than $2,200,000 plus prejudgment interest.

## **FIFTH CAUSE OF ACTION – Fraudulent Inducement**

### **(Against Robl and Chase, and DOES 1-20, inclusive)**

88.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

89.     Robl and Chase, who were working in concert with one another, made materially false representations to SSF throughout 2019 until the present. Robl and Chase knew at the time they were inducing SSF to enter into the various agreements between the respective parties and to wire monies to Production Capital and the Abramoff Account, they were omitting material facts that SSF was entitled to know and would want to know.

90.     Robl and Chase knew that these false representations and omission would impact SSF's decision to provide financing loans to 10-13, Production Capital, the Abramoff Account, Chase, and enter into the Assignment Agreements with HMV. These

materially false representations and omissions were by way of email, documentation, and verbal.

91.     For example, on July 21, 2019, to induce SSF to enter into the 10-13 Loan, Chase emailed SSF with an alleged script and document purporting to list the involvement of Nicholas Cage, Marisa Tomei, Famke Janssen, and Mekhi Phifer in the 10-13 film, with a start date of August 19, 2019. This was false. Notably, 10-13 Productions is now dissolved. Chase knew the funds should be used for financing 10-13 Productions and the 10-13 film under the Agreement. Instead, the funds were moved out of the account and used for other improper purpose unbeknownst to SSF.

92.     Similarly, Robl induced SSF to enter into the CAA with Production Capital to provide a bridge loan of $550,000 by way of a September 23, 2021, email wherein Robl stated that the bridge loan would allow Production Capital to access a credit line from Kennedy Lewis in the amount of $25,000,000 to HMV and HMV Related Entities. Production Capital or HMV would then wire $10,000,000 to SSF to pay down all previous advances and credits that SSF made to Production Capital and related entities. Further, Chase provided screen shots of an alleged $27,000,000 in an HMV bank account. Such false statements further induced SSF to enter into the 10-13 Assignment, Chase Assignment, and Production Capital Assignment with HMV. These representations were false; HMV never repaid the $6,516,250 owed under the Assignment Agreements.

93.     Robl and Chase intended that SSF would rely on their material misrepresentations and omissions in deciding to provide financing loans to 10-13 Productions, Production Capital, Chase, and to wire funds to the Abramoff Account, as well as entering into the Assignment Agreements with HMV. These misrepresentations and omissions include providing SSF seemingly legitimate documents that were later deemed false.

94.     In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, SSF provided financing loans, entered into the aforementioned initial agreements and

**COMPLAINT**

assignment agreements. SSF would not have made these financing loans, entered into such agreements, and would not have suffered economic loss, had true information been disclosed. SSF's reliance upon these statements was reasonable.

95.     Robl and Chase's misstatements and omissions pertained to the very risk that was concealed by those same misrepresentations and omissions. Their misstatements and omissions concealed facts that negatively affected the risk and value of SSF's financing loans.

96.     As a direct and proximate result of Robl and Chase's wrongful conduct, SSF has been damaged in a total amount of not less than $6,516,250 plus prejudgment interest.

97.     Additionally, SSF is seeking punitive damages for Robl and Chase's conduct. They acted maliciously and fraudulently by misleading SSF over two years and swindling it out of significant amounts of financing loans. The conduct was intentional and wanton, such that it justifies awarding punitive damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION – Intentional Misrepresentation
### (Against Robl and Chase, and DOES 1-20, inclusive)

98.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

99.     Robl and Chase, who were working in concert with one another, made materially false representations to SSF throughout 2019 until the present. Robl and Chase knew at the time they were inducing SSF to enter into the various agreements between the respective parties and to wire monies to Production Capital and the Abramoff Account, they were omitting material facts that SSF was entitled to know and would want to know.

100.   Robl and Chase knew that these false representations and omission would impact SSF's decision to provide financing loans to 10-13, Production Capital, the Abramoff Account, Chase, and enter into the Assignment Agreements with HMV. These materially false representations and omissions were by way of email, documentation, and verbal.

101. For example, on July 21, 2019, to induce SSF to enter into the 10-13 Loan, Chase emailed SSF with an alleged script and document purporting to list the involvement of Nicholas Cage, Marisa Tomei, Famke Janssen, and Mekhi Phifer in the 10-13 film, with a start date of August 19, 2019. This was false. Notably, 10-13 is now dissolved. Chase knew the funds would not be used for financing 10-13, but would be used for other improper purposes.

102. Similarly, Robl induced SSF to enter into the CAA with Production Capital to provide a bridge loan of $550,000 by way of a September 23, 2021, email wherein Robl stated that the bridge loan would allow Production Capital to access a line of credit from Kennedy Lewis in the amount of $25,000,000 to HMV and HMV Related Entities. Production Capital or HMV would then wire $10,000,000 to SSF to pay down all previous advances and credits that SSF made to Production Capital and related entities. Further, Chase provided screen shots of an alleged $27,000,000 in an HMV bank account. Such false statements further induced SSF to enter into the 10-13 Assignment, Chase Assignment, and Production Capital Assignment with HMV. These representations were false; HMV never repaid the $6,516,250 owed under the Assignment Agreements.

103. Additionally, Robl continued to mislead SSF after entering into the Assignment Agreements and upon SSF Shareholder seeking out repayment of the 10-13 Assignment, Chase Assignment, and Production Capital Assignment. From December 21, 2021, to January 23, 2022, by way of a messaging system called, "Signal," Robl provided false statements to SSF Shareholder. For example, on December 30, 2021, Robl stated to SSF Shareholder, "…KL sending to HMV funding account. Friday, HMV sending direct to u Monday…" Robl continued the falsities and on January 1, 2022, "…HMV acct. funded. We will send payments Monday…" This was false. Robl later stated to SSF Shareholder on January 14, 2022, "Confirmed HMV funds finally going out Tuesday…" This was also false and did not occur.

104. Robl and Chase intended that SSF would rely on their material misrepresentations and omissions in deciding to provide financing loans to 10-13

Productions, Production Capital, Chase, and to wire funds to the Abramoff Account, as well as entering into the Assignment Agreements with HMV. These misrepresentations and omissions include providing SSF seemingly legitimate documents that were later deemed false.

105.   In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, SSF provided financing loans, entered into the aforementioned agreements and assignment agreements. SSF would not have made these financing loans, and would not have suffered economic loss, had true information been disclosed. SSF's reliance upon these statements was reasonable.

106.   Robl and Chase's misstatements and omissions pertained to the very risk that was concealed by those same misrepresentations and omissions. Their misstatements and omissions concealed facts that negatively affected the risk and value of SSF's financing loans.

107.   As a direct and proximate result of Robl and Chase's wrongful conduct, SSF has been damaged in a total amount of not less than $6,516,250 plus prejudgment interest.

108.   Additionally, SSF is seeking punitive damages for Robl and Chase's conduct. They acted maliciously and fraudulently by misleading SSF over two years and swindling it out of significant amounts of financing loans. The conduct was intentional and wanton, such that it justifies awarding punitive damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION – Negligent Misrepresentation
### (Against Robl and Chase, and DOES 1-20, inclusive)

109.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

110.   The relationship between SSF, Robl, and Chase spanned nearly a three-year period and constituted a relationship in which SSF maintained deep trust, dependence, confidence, counsel, and reliance.

**COMPLAINT**

111.   Robl and Chase made materially false representations and omissions to SSF. Robl was the principal and in direct control of Production Capital and HMV. Chase was a close business and personal associate of Robl. Additionally, Chase was directly involved in drafting, producing, and disseminating materials to SSF related to the 10-13 Loan, the Chase note, and the money wires sent to the Abramoff Account.

112.   Even if Robl and Chase may have honestly believed that the representations, they made to SSF were true, they had no reasonable grounds for believing them to be true when they made the representations.

113.   Robl and Chase intended that SSF would rely on their material misrepresentations and omissions in deciding to provide financing loans to 10-13 Productions, Production Capital, Chase, and to wire funds to the Abramoff Account, as well as entering into the Assignment Agreements with HMV. These misrepresentations include providing SSF seemingly legitimate documents that were later deemed false.

114.   In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, SSF provided financing loans, entered into the aforementioned agreements and assignment agreements. SSF would not have made these financing loans, and would not have suffered economic loss, had true information been disclosed. SSF's reliance upon these statements was reasonable.

115.   Robl and Chase's misstatements and omissions pertained to the very risk that was concealed by those same misrepresentations and omissions. Their misstatements and omissions concealed facts that negatively affected the risk and value of SSF's financing loans.

116.   As a direct and proximate result of Robl and Chase's wrongful conduct, SSF has been damaged in a total amount of not less than $6,516,250 plus prejudgment interest.

### **EIGHTH CAUSE OF ACTION – Concealment**

**(Against Robl, Chase, Robert Abramoff, and DOES 1-20, inclusive)**

**COMPLAINT**

117.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

118.   The relationship between SSF, Robl, and Chase spanned nearly a three-year period and constituted a relationship in which SSF maintained deep trust, dependence, confidence, counsel, and reliance. Additionally, Robert Abramoff, as the principal of the Abramoff Firm, owed SSF a fiduciary duty by virtue of the agreement to hold SSF's funds in the Abramoff Account under the Chase Note, 10-13 Loan, and the corresponding wires.

119.   Robl, Chase, and Robert Abramoff concealed material facts that were only known or should have been known or accessible to them and failed to disclose those material facts to SSF. Robl was the principal and in direct control of Production Capital and HMV. Chase was a close business and personal associate of Robl. Additionally, Chase was directly involved in drafting, producing, and disseminating materials to SSF related to the 10-13 Loan, the Chase note, and the money wires sent to the Abramoff Account that Robert Abramoff controlled.

120.   Robl and Chase knew at the time they were inducing SSF to enter into the various agreements between the respective parties and to wire monies to Production Capital and the Abramoff Account, they were omitting material facts that SSF was entitled to know and would want to know. Among the various omissions alleged previously, Chase omitted that there was no 10-13 film in existence that necessitated any funds/loans from SSF.

121.   Robl falsely represented that the $550,000 bridge loan from SSF would allow Production Capital to access a line of credit from Kennedy Lewis in the amount of $25,000,000 to HMV and HMV Related Entities. Production Capital or HMV would then wire $10,000,000 to SSF to pay down all previous advances and credits that SSF made to Production Capital and related entities. Further, Chase provided screen shots of an alleged $27,000,000 in an HMV bank account. Robl omitted the material fact that the line of credit either did not exist, or Robl, Chase, Production Capital, HMV, and the Abramoff

Firm/Abramoff Account would be using the line of credit to pay off other investors, creditors, business expenses, and/or personal expenses.

122.   At the time of concealing material facts, Robl, Chase, and Robert Abramoff were aware these material facts were only known or should have been known or accessible to them. Robl, Chase, and Robert Abramoff knew the material facts were not reasonably discoverable to SSF.

123.   SSF was in fact unaware of the concealed facts and the true intentions of Robl, Chase, and Robert Abramoff. Robl, Chase, and Robert Abramoff intended to conceal these material facts and did in fact conceal such material facts. Had SSF been aware of Robl, Chase, and Robert Abramoff's true intentions, SSF would not have entered into the underlying loans and subsequent assignment agreements. Robl, Chase, and Robert Abramoff's omissions concealed material facts that negatively affected the risk and value of SSF's financing loans.

124.   As a direct and proximate result of Robl, Chase, and Robert Abramoff's wrongful conduct, SSF has been damaged in a total amount of not less than $6,516,250 plus prejudgment interest.

125.   Additionally, SSF is seeking punitive damages for Robl, Chase, and Robert's Abramoff's conduct. They acted maliciously and fraudulently by misleading SSF over two years and swindling it out of significant amounts of financing loans. The conduct was intentional and wanton, such that it justifies awarding punitive damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION – Conversion

### (Against Production Capital, Production Capital Corp., HMV, HMV Related Entities, the Abramoff Firm, Base Swiss, Shaaban, Robert Abramoff, Robl, Chase, and DOES 1-20, inclusive)

126.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

127.   SSF owned and had a right to possess the money that it provided to the Abramoff Account and directly to Production Capital. SSF provided wires of $1,600,000 to 10-13 (which was assigned to HMV); $2,200,000 to the Abramoff Account (as part of the 10-13 financing loan and Chase Note); and $550,000 to Production Capital for a total of $4,350,000. At no time should the money have left the Abramoff Account, Production Capital, or 10-13 Productions' bank accounts. By way of the December 19, 2021, Assignment Agreements, SSF had a right to recover these amounts plus interest from HMV on December 29, 2021.

128.   Defendants Production Capital, Production Capital Corp., HMV, HMV Related Entities, the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, Shaaban, and each of them, substantially interfered with SSF's property by intentionally taking possession of the money SSF deposited into the Abramoff Account, Production Capital, and 10-13 Productions' bank accounts.

129.   Defendants Production Capital, Production Capital Corp., HMV, HMV Related Entities, the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, Shaaban, and each of them, have prevented SSF from having access to its financing loans, and have refused to return the funds despite numerous demands by SSF.

130.   SSF did not consent to have its money taken by Defendants Production Capital, Production Capital Corp., HMV, HMV Related Entities, the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, Shaaban, and did not consent to have its money held longer than the amount of time agreed to in each specific agreements, nor commingled with other funds to be used for other purposes. In truth, the 10-13 Loan, Chase Note, and CAA, as well as the subsequent Assignment Agreements were "short term" investment opportunities.

131.   As a direct and proximate result of Production Capital, Production Capital Corp., HMV, HMV Related Entities, the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, and Shaaban's wrongful conduct, SSF has been damaged in a total amount of not less than $4,350,000 plus prejudgment interest.

132.   Additionally, SSF is seeking punitive damages for Production Capital, Production Capital Corp., HMV, HMV Related Entities, the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, and Shaaban's conduct. They acted maliciously and fraudulently by misleading SSF over two years and swindling it out of significant amounts of financing loans. The conduct was intentional and wanton, such that it justifies awarding punitive damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION – Account Stated

### (Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, and Robl, and DOES 1-20, inclusive)

133.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

134.   Within the past year, an account in writing was stated between SSF and HMV, wherein HMV agreed it was obligated to pay SSF per the 10-13 Assignment, Chase Assignment, and Production Capital Assignment, which is the sum of $6,516,250.

135.   Defendants have since refused to pay any of the $6,516,250 owed, although SSF has made repeated demands for payment, and there is now due, owing, and unpaid from Defendants to SSF the sum of not less than $6,516,250 plus prejudgment interest accrued since December 29, 2021, the date of the account stated.

## ELEVENTH CAUSE OF ACTION – Civil RICO 18 U.S.C. §1962(c)

### (Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Robl, Chase, the Abramoff Firm, Robert Abramoff, Base Swiss, Shaaban, and DOES 1-20, inclusive)

136.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

137.   SSF, HMV, HMV Related Entities, Production Capital, Production Capital Corp., the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, and Shaaban are all "persons" as that term is defined in 18 U.S.C. § 1961(3).

138.   Defendants HMV, HMV Related Entities, Production Capital, Production Capital Corp., the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, and Shaaban, including all of their employees and agents, formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), in order to fraudulently induce and defraud SSF into providing loan financing through the initial loans and subsequent assignment agreements (hereinafter, "Loan Scheme").

139.   The Loan Scheme is an ongoing organization consisting of a variety of legal "persons" that associated in common and share purposes, including, but not limited to: (a) defraud SSF out of $4,350,000 by misrepresenting and omitting material facts about HMV, HMV Related Entities, Production Capital, and 10-13 Productions, their financial state and business models; (b) to use SSF's funds to pay off existing creditors and/or pay unrelated personal and business expenses; (c) to falsify business records, deal documents, inflate the value of Production Capital, HMV, and 10-13 Productions; and provide false security about the risk level of the various loans and subsequent assignment agreements; (d) to fraudulently induce SSF to wire a total of $4,350,000 to the Abramoff Account, Production Capital, HMV, and 10-13 Productions' bank accounts; (e) to falsely state that SSF's funds would remain in the Abramoff Account, Production Capital, HMV, and 10-13 Productions' bank accounts; (f) to conceal the true nature of the loan risk to SSF and the improper purpose and use of SSF's funds.

140.   Through the coordinated efforts of Robl and Chase and the assistance of the Abramoff Firm and Robert Abramoff, and Base Swiss and Shaaban, they utilized Production Capital, HMV, HMV Related Entities, 10-13 Productions, the Abramoff Account, and Base Swiss to defraud SSF. They used HMV, HMV Related Entities, Production Capital, Production Capital Corp., and Base Swiss as shell entities to abscond with $4,350,000 of SSF's funds, and transfer assets to HMV, HMV Related Entities, Production Capital, Production Capital Corp., and Base Swiss. Chase provided false documents regarding the alleged 10-13 film to fraudulently induce SSF into providing the 10-13 Loan. Notably, 10-13 Productions is now dissolved, and no such film ever existed.

Robl made various false representations and omissions to fraudulently induce SSF into entering into the CAA. Robl and Shaaban utilized Base Swiss to transfer SSF's assets to Base Swiss and abscond with such funds, as well as purchasing real property.

141.   Robl also falsely indicated HMV, HMV Related Entities, and Production Capital would be obtaining a line of credit of $25,000,000 from Kennedy Lewis to fund HMV, HMV Related Entities, and Production Capital, fraudulently inducing SSF to enter into the 10-13 Assignment, Chase Assignment, and Production Capital Assignment. Further, Chase provided screen shots of an alleged $27,000,000 in an HMV bank account. In reality, none of this occurred and was merely a false scheme that allowed HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, and Chase to steal SSF's money.

142.   The goal of the Loan Scheme was to provide a financial windfall to HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, and Chase using SSF's money. SSF reasonably relied on the numerous misrepresentations told by Robl and Chase in deciding to provide loan financing to HMV, Production Capital, 10-13 Productions, Robl, and Chase, to its own detriment. Robl, Chase, and Robert Abramoff also omitted various material facts related the various financing loans by way of email.

143.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., the Abramoff Firm, Base Swiss, Robert Abramoff, Robl, Chase, and Shaaban necessarily used the mail and wires to perpetrate the Loan Scheme. Chase emailed SSF false documents regarding an alleged 10-13 film, falsely stating that key actors would be involved in the film to fraudulently induce SSF's financing loans. Robl provided false statements by way of email, text messages, and a "Signal" messaging system with regards to HMV, HMV Related Entities, and Production Capital having a $25,000,000 credit line with Kennedy Lewis. Further, Chase provided screen shots of an alleged $27,000,000 in an HMV bank account. This was designed to fraudulently induce the bridge loan under the CAA and the subsequent assignment agreements. HMV, HMV Related Entities,

Production Capital, Robl, Robert Abramoff, and Chase defrauded SSF into wiring a total of $4,350,000 to the Abramoff Account, Production Capital, and 10-13 bank accounts. Base Swiss and Shaaban assisted Robl in wiring SSF's funds from HMV, HMV Related Entities, Production Capital, Production Capital Corp., to Base Swiss, absconding with the money and fraudulently purchasing real property. All of this constitutes a pattern of racketeering activity by mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

144.   The Loan Scheme involved interstate and foreign commerce. Both HMV, HMV Related Entities, and Production Capital are organizations formed and registered in Delaware, while conducting business in Los Angeles County, California. Base Swiss is a company registered in Baar, Switzerland. SSF is also informed and believes, and based thereon alleges, that HMV, HMV Related Entities, Production Capital Corp., Production Capital have multiple bank accounts across the United States, including in New York, which is the location of the Production Capital bank account to which SSF wired $550,000 pursuant to the CAA. As a result, the Loan Scheme, by definition, involves interstate and/or foreign commerce.

145.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban's violations of 18 U.S.C. § 1962(c) directly and proximately caused SSF to suffer substantial injury because their pattern of racketeering activity caused SSF to unwittingly participate in the Loan Scheme. It also caused SSF to lose over $6,516,250 in financing loans that would not otherwise have been lost, but for HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban's illegal acts.

146.   As a direct and proximate result of HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban's unlawful racketeering activity, SSF suffered and continue to suffer damages in an amount to be proven at trial, but of at least $6,516,250.

**COMPLAINT**

Under the provisions of 18 U.S.C. § 1964(c), HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban are jointly and severally liable to SSF for three times the damages that SSF has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

## **TWELFTH CAUSE OF ACTION – Civil RICO Conspiracy 18 U.S.C. §1962(d)**

### **(Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, Shaaban, and DOES 1-20, inclusive)**

147.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

148.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban formed an agreement to violate 18 U.S.C. § 1962(c). Each of them knew or should have known of the Loan Scheme's conspiracy to defraud SSF by presenting fraudulent documents; financial records and other information; offering false investments in fictitious films; fraudulently inducing SSF to enter into various loan agreements and assignment agreements; omitting material facts; breaching fiduciary duties, converting SSF's assets, and committing wire fraud.

149.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban each agreed to join this conspiracy, and each of them agreed to commit, facilitate, or participate in a pattern of racketeering activity in furtherance of the conspiracy.

150.   During the conspiracy's existence, HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban agreed to the commission of an indefinite number of predicate acts in furtherance of the Loan Scheme.

151.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban agreed to and did commit multiple instances of mail and wire fraud in furtherance of the conspiracy by e-mailing, texting, and messaging, fraudulent film documents, financial records, deal documents, and other agreements to SSF, as well as fraudulently inducing SSF to wire $4,350,000 to the Abramoff Account, HMV, Production Capital and 10-13 Production bank accounts. This also included using financial wires to transfer and abscond with SSF funds by way of the Loan Scheme. HMV, Production Capital, Robl, and Chase also devised the scheme, created and forged certain deal documents, sent fake investment details to SSF, and concealed the Loan Scheme from SSF in written and oral communications through the mail, email, text messages, and telephone.

152.   As a direct and proximate result of HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban's unlawful racketeering activity, SSF suffered and continues to suffer damages in an amount to be proven at trial, but of at least $6,516,250. Under the provisions of 18 U.S.C. §1964(c), HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, the Abramoff Firm, Robert Abramoff, Chase, and Shaaban are jointly and severally liable to SSF for three times the damages that SSF has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

## THIRTEENTH CAUSE OF ACTION – Fraudulent Transfer (CA Civil Code §3439 et seq.)

### (Against HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, Chase, Shaaban, and DOES 1-20, inclusive)

153.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

154.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, Chase, and Shaaban, operating as alter-egos and co-conspirators

**COMPLAINT**

transferred or caused to be transferred portions of or the bulk of the $4,350,000 that the aforementioned parties and the other Defendants assisted in fraudulently obtaining from SSF. Upon information and belief, Base Swiss transacted upwards of $2,500,000, through various banking institutions, which included the money owed to SSF.

155.   Robl was a member of the board of directors for Base Swiss from in and around May 9, 2019, until in and around March 26, 2021, along with Shaaban who was the President of the Board of Directors from Base Swiss's incorporation on or about April 30, 2019, until the present. SSF is informed and believes that Robl, Production Capital, Production Capital Corp., HMV, HMV Related Entities, Shaaban, and Chase utilized Base Swiss to fraudulently transfer the $4,350,000 in SSF's funds and purchase real property in order to evade repayment of the various loans owed to SSF. Shaaban, as President of the Board of Directors, was aware of or should have been aware of Base Swiss being used to funnel fraudulent funds owed to SSF and any subsequent purchase of real property with SSF's funds.

156.   Such actions constitute a "transfer" within the meaning of *California Civil Code* § 3439.01(m). This was done with the actual intent to hinder, delay, or defraud SSF under *Civil Code* § 3439.04. Such transfer was made without proper consideration between HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, Chase, and Shaaban. They concealed the transfer, and retained control of the transferred property. These actions are constructively fraudulent under *Civil Code* §§ 3439.04 & 3439.5.

157.   HMV, HMV Related Entities, Production Capital, Production Capital Corp., Robl, and Chase are deemed "debtors" under *California Civil Code* § 3439.01(e), and SSF, having a claim against them is deemed a "creditor" under *Civil Code* §3439.01(c).

158.   Base Swiss and Shaaban are a "transferee" under *Civil Code* §3439, et seq, and an insider for purposes of the Fraudulent Transfer Act and applicable case law.

159.   To date, HMV, HMV Related Entities, Production Capital, Base Swiss, Robl, Chase, and Shaaban refuse to return or account for any of the upwards of $4,350,000

potentially transferred to Base Swiss and Shaaban. This was done with the actual intent to hinder, delay, and defraud SSF, and accordingly, SSF asserts its right to avoid all fraudulent transfers between HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, Chase, and Shaaban.

160.   As a direct and proximate result of HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, Chase, and Shaaban's wrongful conduct, SSF has been damaged in a total amount of not less than $4,350,000 plus prejudgment interest.

161.   Additionally, SSF is seeking punitive damages for HMV, HMV Related Entities, Production Capital, Production Capital Corp., Base Swiss, Robl, Chase, and Shaaban's conduct. They acted maliciously and fraudulently by misleading SSF over two years and swindling it out of significant amounts of financing loans. The conduct was intentional and wanton, such that it justifies awarding punitive damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief:

### **First Cause of Action – Breach of Written Contract (1): 10-13 Assignment**

1. Compensatory damages in an amount to be proven at trial, but not less than $4,019,925;
2. All applicable statutory damages;
3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);
4. For costs of suit; and
5. For such other and further relief as the Court may deem proper.

### **Second Cause of Action – Breach of Written Contract (2): Chase Assignment**

1. Compensatory damages in an amount to be proven at trial, but not less than $1,010,625;
2. All applicable statutory damages;
3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

**COMPLAINT**

4. For costs of suit; and

5. For such other and further relief as the Court may deem proper.

**Third Cause of Action – Breach of Written Contract (3): Production Capital Assignment**

1. Compensatory damages in an amount to be proven at trial, but not less than $1,010,625;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4. For costs of suit; and

5. For such other and further relief as the Court may deem proper.

**Fourth Cause of Action – Breach of Fiduciary Duty**

1. Compensatory damages in an amount to be proven at trial, but not less than $2,200,000;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4. For costs of suit; and

5. For such other and further relief as the Court may deem proper.

**Fifth Cause of Action –Fraudulent Inducement**

1. For special and general damages in an amount to be proven at trial, but not less than $6,516,250;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4. For punitive and exemplary damages;

5. For costs of suit; and

6. For such other and further relief as the Court may deem proper.

**Sixth Cause of Action –Intentional Misrepresentation**

1. For special and general damages in an amount to be proven at trial, but not less than $6,516,250;

**COMPLAINT**

2.  All applicable statutory damages;

3.  Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4.  For punitive and exemplary damages;

5.  For costs of suit; and

6.  For such other and further relief as the Court may deem proper.

**Seventh Cause of Action – Negligent Misrepresentation**

1.  For special and general damages in an amount to be proven at trial, but not less than $6,516,250;

2.  All applicable statutory damages;

3.  Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4.  For costs of suit; and

5.  For such other and further relief as the Court may deem proper.

**Eighth Cause of Action – Concealment**

1.  For special and general damages in an amount to be proven at trial, but not less than $6,516,250;

2.  All applicable statutory damages;

3.  For punitive and exemplary damages;

4.  Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

5.  For costs of suit; and

6.  For such other and further relief as the Court may deem proper.

**Ninth Cause of Action – Conversion**

1.  For general and special damages in an amount to be proven at trial, but not less than $6,516,250;

2.  All applicable statutory damages;

3.  Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4.  For punitive and exemplary damages;

5.  For costs of suit; and

6.  For such other and further relief as the Court may deem proper.

**COMPLAINT**

**Tenth Cause of Action – Account Stated**

1. Compensatory damages in an amount to be proven at trial, but not less than $6,516,250;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4. For costs of suit; and

5. For such other and further relief as the Court may deem proper.

**Eleventh Cause of Action – Civil RICO 18 U.S.C. §1962(c)**

1. For general and special damages in an amount to be proven at trial, but not less than $6,516,250;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4. For mandatory treble damages;

5. For costs of suit and reasonable attorneys' fees; and

6. For such other and further relief as the Court may deem proper.

**Twelfth Cause of Action – Civil RICO Conspiracy 18 U.S.C. §1962(d)**

1. For general and special damages in an amount to be proven at trial, but not less than $6,516,250;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4. For mandatory treble damages;

5. For costs of suit and reasonable attorneys' fees; and

6. For such other and further relief as the Court may deem proper.

**Thirteenth Cause of Action – Fraudulent Transfer (CA Civil Code §3439 et seq.)**

1. For general and special damages in an amount to be proven at trial, but not less than $4,350,000;

2. All applicable statutory damages;

3. Pre-judgment interest pursuant to Civil Code section 3287, 3289(b);

4.  For punitive and exemplary damages;

5.  For costs of suit; and

6.  For such other and further relief as the Court may deem proper.

DATED: December 8, 2022                THE LAW OFFICES OF THOMAS S. CARTER

By:_____

THOMAS S. CARTER, ESQ.
Attorney for Plaintiff SILVER SCREEN
FILMS INC.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: December 8, 2022                THE LAW OFFICES OF THOMAS S. CARTER

By:_____

THOMAS S. CARTER, ESQ.
Attorney for Plaintiff
SILVER SCREEN FILMS INC.

**COMPLAINT**

# EXHIBIT 1

  

**Export**   **Print**   **Close**

Transfer Details

| | |
|---|---|
| Reference Number: | **FT1909276553** |
| Fund Transfer Type: | **Telegraphic Transfer** |
| Status: | **Transmitted to bank** |
| | **( Sent to bank. )** |
| Application Date: | **03/09/2019** |
| Value Date: | **03/09/2019** |
| Account Number: | ████████████████ |
| Account Currency: | **USD** |
| Fund Transfer Amount: | **USD 1,500,000.00** |
| Charges Borne By: | **Applicant** |
| Delivery Method: | **SWIFT** |

Sent notification to beneficiary on the following address:
**jwang@silverscreenfinance.com**

Beneficiary Details

| | |
|---|---|
| Name: | **BURGEE AND ABRAMOFF CLIENT TRUST** |
| Account Number: | ████████████████ |
| Address: | **ACCOUNT** |

Beneficiary Bank Details

| | |
|---|---|
| Bank name: | **WELLS FARGO BANK, N.A.** |
| ISO code: | **WFBIUS6SXXX** |
| Bank Address: | **420 MONTGOMERY STREET** |
| | **SAN FRANCISCO,CA 94104** |
| | **SAN FRANCISCO,CA** |
| Country code: | **US** |

Comment from the Bank:

Completed

Transfer History Details

| Initiating User | Action | Date and Time Of Action |
|---|---|---|
| SILVERJW | Creation and Full Authorisation | 03/09/2019 14:21:22 |

  

**Export**   **Print**   **Close**

**Transfer Details**

| | |
|---|---|
| Reference Number: | **FT1909276797** |
| Fund Transfer Type: | **Telegraphic Transfer** |
| Status: | **Transmitted to bank** |
| | **( Sent to bank. )** |
| | |
| Application Date: | **05/09/2019** |
| Value Date: | **05/09/2019** |
| | |
| Account Number: | ███████████████ |
| Account Currency: | **USD** |
| Fund Transfer Amount: | **USD 1,600,000.00** |
| Charges Borne By: | **Applicant** |
| Delivery Method: | **SWIFT** |

Sent notification to beneficiary on the following address:
**jwang@silverscreenfinance.com**

**Beneficiary Details**

| | |
|---|---|
| Name: | **10-13 PRODUCTIONS INC** |
| Account Number: | ████████████████ |
| Address: | **2121 AVENUE OF THE STARS** |
| | **LOS ANGELES CA 90067** |

**Beneficiary Bank Details**

| | |
|---|---|
| Bank name: | **BANK OF AMERICA, N.A.** |
| ISO code: | **BOFAUS3NXXX** |
| Bank Address: | **8560 SUNSET BLVD 4TH FLOOR** |
| | **WEST HOLLYWOOD CA 90069** |
| Country code: | **US** |

**Comment from the Bank:**

Completed

**Transfer History Details**

| Initiating User | Action | Date and Time Of Action |
|---|---|---|
| SILVERJW | Creation and Full Authorisation | 05/09/2019 11:02:13 |

LOAN AGREEMENT

This Agreement ("Agreement") is entered into on this 2nd day of September, 2019 by and between 10-13 Productions, Inc. with an address at 2121 Avenue of the Stars, Los Angeles, CA 90067 and with a registered office: 30765 Pacific Coast Hwy, Ste 369, Malibu, CA 90265 ("Borrower") and Silver Screen Finance Inc. a limited liability company organized and existing under the laws of Cayman, with an address at Double Cove, Tower 2, Suite 8E, 8 Wu Kai Sha Road, Ma On Shan, New Territories, Central, Hong Kong ("Lender"), with regard to the following:

1.   Loan.     Lender agrees to loan to Borrower the sum of Three Million One Hundred United States dollars (US $3,100,000) (the "Loan"), subject to the conditions herein.   The loan will be remitted to Borrower's dedicated bank account as set forth on Exhibit A ("Borrower Account") on or before September 5, 2019 by (a) wire transfer of US $1,600,000 from Lender's bank account as set forth on Exhibit A ("Lender Account") and (b) wire transfer of US $1,500,000 from the Attorney Client Trust Account of Burgee & Abramoff as set forth on Exhibit A ("Law Firm Trust Account").

2.   Purpose.     The proceeds of the Loan will be used solely to remain on deposit in the Borrower Account bank account until such time as the completion guarantor for the motion picture currently entitled "10-13" ("Picture") issues a completion guaranty for the Picture ("Completion Guaranty").       For clarity, the entirety of the Loan proceeds may not be expended or removed from the Account for any reason other than the repayment of the Loan as set forth in section 3 below unless authorized in advance in writing by Lender.

3. Borrower Account.   The Borrower Account will be used solely in connection with this Loan Agreement with no other co-mingled funds of the Borrower. Borrower further acknowledges and warrants that the sole signatory authority for the Borrower Account resides with Ramon Laconico. For avoidance of doubt, the Borrower Account and its sole signatory shall persist until the full repayment of the Loan as specified in section 4 below.   Lender shall have full authority to contact the bank representative without prior notice as specified in Appendix A

4. Repayment of Loan.   Upon the issuance of the Completion Guaranty, Borrower will repay the Loan plus flat interest equal to 25% of the Loan (i.e. $775,000) for a total repayment of $3,875,000 ("Repayment Amount") by wire transfer as follows: (a) $2,375,000 to the Lender Account and (b) $1,500,000 to the Law Firm Trust Account.     In the event the Completion Guaranty is not issued on or before September 9, 2019, on September 10, 2019, Borrower will return the Loan plus a flat interest equal to 5% of the Loan (i.e. $155,000) as follows: (a) $1,755,000 to the Lender Account and (b) $1,500,000 to the Law Firm Trust Account.

5.   Representations and Warranties.     Borrower represents and warrants: (a) it has the right, power, authority and capacity to enter into this Agreement, and this Agreement represents the legal, valid, and binding obligation of Borrower, enforceable against Borrower in accordance with its terms; (b) it will ensure that all accounts owed Lender under this Agreement shall be repaid when due hereunder; (c) it owns or controls (or will

1

own or control prior to the commencement of principal photography of the Picture) all rights in a n d to the Original Screenplay, and any o t h e r material and elements to be included therein, free of any claims or encumbrances of any third party other than secured lenders and other lien holders; and (e) to the best of Borrower's knowledge, neither the Screenplay, nor any part thereof, violate or infringe the copyright, literary, thematic, personal, private or civil or property rights or rights of privacy or any other rights of any third party. Borrower represents and warrants that the execution, delivery, and performance of this Agreement are not in conflict with any law or any indenture, agreement, or undertaking to which Borrower is a party or by which Borrower is bound or affected.

6.    Covenants.    Borrower agrees, until full and final payment of all sums outstanding under this Agreement, Borrower will promptly give oral or written notice to Lender of: (a) all litigation affecting Borrower where the amount of damages being sought exceeds $10,000; and (b)    any other matter which has resulted or might result in a material adverse change in Borrower's financial condition or its ability to transfer the applicable amounts due by September 10, 2019.

7.    Miscellaneous

    7.0    Perfection of Security Interest. Borrower hereby acknowledges that Lender may perfect a security interest or lien in Lender's favor as defined in the Uniform Commercial Code, subject to the terms hereof, with no conflicting liens and/or security interests in any of the rights in and to the Picture and Screenplay until loan under Section 4 is repaid in full.

    7.1    Further Documents.    Borrower hereby agrees to execute such further documents and instruments as Lender may reasonably request in order to effectuate the terms and intentions of this Loan Agreement and amendments, if any, and in the event that Borrower fails or is unable to execute any such documents or instruments, Borrower hereby irrevocably appoint Lender as its attorney-in-fact, coupled with an interest, for the purpose of executing any such documents and instruments.

    7.2    This Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns; provided, however, that Borrower shall not assign this Agreement or any of the rights, duties or obligations of Borrower without the prior written consent of Lender.

    7.3    No consent or waiver under this Agreement shall be effective unless in writing.   No waiver of any breach or default shall be deemed a waiver of any breach or default thereafter occurring.   No reliance upon or waiver of one or more provisions of this Agreement shall constitute a waiver of any other provisions hereof.

    7.4    Governing Law.    This Agreement will be governed by the laws of the State of California without regard to conflicts of laws principles.   This Agreement has been jointly prepared by the parties and no rule of strict construction (or comparable rule) shall apply against either of them.   Subject to any arbitration provisions, venue for any legal proceedings initiated by any party hereto shall lie exclusively in a court of competent jurisdiction located in Los Angeles County, California, and each party hereto consents to venue and jurisdiction in any such

2

court.

7.5     COUNTERPARTS.   This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same instrument. Delivery of any executed counterpart of this Agreement by facsimile or transmitted electronically in either a Tagged Image Format File ("TIFF"), Portable Document Format ("PDF") or Joint Photographic Experts Group format ("JPEG") shall be equally effective as delivery of a manually executed counterpart of this Agreement.   Any party delivering an executed counterpart by facsimile, TIFF, JPEG or PDF shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not affect the validity, enforceability or binding effect of this Agreement, and the parties hereby waive any right they may have to object to said treatment.

7.6     AMENDMENT AND MODIFICATION.   This Agreement can only be amended or changed by a written agreement signed by the parties.   The parties agree that there can be no oral modification of this Agreement and that any oral modification of this Agreement in any regard will be null and void in all circumstances and that principles of performance and estoppel will be invalid and are hereby waived with respect any attempt to enforce a modification of this Agreement that is not contained in a writing signed by the parties.   With respect to a corporate party to this Agreement, a written modification will be ineffective and unenforceable unless signed by an actual corporate officer, director, manager, managing member, or general partner.   Any document executed by an individual without actual corporate authority will be invalid despite any representations of authority or ostensible authority.

7.7     ENTIRE AGREEMENT.   This Agreement, together with any related documents referred to in this Agreement, constitutes the entire understanding and agreement of the parties with respect to the subject matter of this Agreement, and any and all prior agreements, understandings or representations are hereby terminated and canceled in their entirety and are of no further force or effect.   No representation, promise, inducement or statement of intention has been made by any of the parties hereto not embodied in this Agreement or in the documents referred to herein, and no party shall be bound by or liable for any alleged representation, promise, inducement or statements of intention not set forth or referred to herein.

[signature page follows]

3

IN WITNESS WHEREOF, the parties hereto have executed and delivered this agreement as of the date first above written.

LENDER
SILVER SCREEN FINANCE INC

BORROWER
10-13 PRODUCTIONS, INC.

Name: Julius Wang
Title: Director

Name:
Title:

4

Exhibit A

**Borrower Account and Wire Instructions:**

Bank:            Bank of America
Beneficiary:   10-13 Productions, Inc.
Account:       ███████████
Bank Add:      6300 Sunset Blvd., Hollywood, CA    90028
ABA Routing #:       121000358
SWIFT Code:          BOFAUS3N
Beneficiary Address: 2121 Avenue of the Stars, Los Angeles, CA    90067
Bank representative: [insert name, title and contact details]


**Lender Account and Wire Instructions:**

Bank:            East West Bank, Hong Kong Branch
Beneficiary:   SILVER SCREEN FINANCE INC
Account:       ████████████
Bank Add:       Suite 1108, 11/F, Two International Finance Centre
8 Finance Street, Central, Hong Kong
Swift Code:    EWBKHKHH


**Law Firm Account and Wire Instructions:**

Account Name:       Burgee & Abramoff Client Trust Account
Bank:                    Wells Fargo Bank
Account #:             ████████
ABA/Routing #:        121000248
Swift #:                 WFBIUS6S

# EXHIBIT 2

 East West Bank Hong Kong
address1
address2

Fund Transfer

<div style="background-color:purple; color:white;">Transfer Details</div>

Reference Number:       FT1911292045
Fund Transfer Type:     Telegraphic Transfer
Status:                 Transmitted to bank
                        (Sent to bank.)

Application Date:       27/11/2019
Value Date:             27/11/2019

Account Number:         ███████████
Account Currency:       USD
Fund Transfer Amount:   USD  700,000.00
Charges Borne By:       Applicant
Delivery Method:        SWIFT

Sent notification to beneficiary on the following address:
jwang@silverscreenfinance.com

<div style="background-color:purple; color:white;">Beneficiary Details</div>

Name:                   BURGEE AND ABRAMOFF CLIENT TRUST
Account Number:         ███████████
Address:                ACCOUNT

<div style="background-color:purple; color:white;">Beneficiary Bank Details</div>

Bank name:              WELLS FARGO BANK, N.A.
ISO code:               WFBIUS6SXXX
Bank Address:           420 MONTGOMERY STREET
                        SAN FRANCISCO,CA 94104
                        SAN FRANCISCO,CA
Country code:           US

<div style="background-color:purple; color:white;">Transfer History Details</div>

| Initiating User | Action | Date and Time Of Action |
|---|---|---|
| SILVERJW | Creation and Full Authorisation | 27/11/2019 15:18:27 |

PROMISSORY NOTE

$700,000.00                                    **21 November, 2019**

For value received, the undersigned makers, REMINGTON WILLIAM CHASE, an individual, ("Borrower") promises to pay to the order of SILVER SCREEN FINANCE INC. ("Lender") in United States Dollars and in immediately available funds at any place as Lender may from time to time designate in writing, the "Bridge Loan" referred to, and pursuant to the terms set forth, in that certain Financing Agreement dated **21 November, 2019** (the "Agreement") by and among Borrower and Lender, pursuant to which Lender made a loan in the principal amount of **Seven Thousand US Dollars ($700,000.00)**.

The Loan Repayment consisting of the principal amount and flat interest of 15% or USD$105,000 (which is inclusive of the Loan Fees as defined in the Agreement) shall be payable as provided in the Agreement. All payment due hereunder shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the holder of the Promissory Note and shall be delivered to Lender or Lender's designee.

1. Default. The occurrence of an "Event of Default" as defined in the Agreement shall give the Lender all the rights and remedies set forth in the Agreement.

2. Application of Payments. All payments made hereunder shall be applied first to costs of enforcements, then the Loan Fees (as defined in the Agreement), and the remainder shall be credited against the outstanding amount of the Loan Amount.

3. Waivers. Borrower hereby waives presentment, demand, protest, notice of dishonor, notice of protest and all other notices and demands of every kind, and all suretyship defenses of every kind that would otherwise be available in connection with this Promissory Note, including without limitation any right (whether now or hereafter existing) to require the Lender to first proceed against any person or entity other than Borrower.

4. Miscellaneous Provisions.  Borrower agrees to provide Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.  Without releasing or affecting any of its rights, Lender may, one or more times, in its sole discretion, take any one or more of the following actions: (a) release, renew or modify the obligations of Borrower; (b) grant any postponements, compromises, indulgences, waivers, surrenders or discharges or modify the terms of its agreements with Borrower; or (c) change its manner of doing business with Borrower or any other party, and Borrower hereby expressly waives any defenses arising from any such actions. For purposes of executory process, Borrower hereby acknowledges the debt created hereby, confesses judgment in favor of Lender for the full amount of the debt evidenced by this Promissory Note, and consents to enforcement by executory process. The rights, remedies, and recourses of Lender, as provided in this Promissory Note, shall be cumulative and concurrent and may be pursued separately, successively or together as often as occasion therefore shall arise, at the sole discretion of Lender.  No failure or delay of Lender in exercising its rights shall be construed as a waiver.

1

All payments of principal or interest on this Promissory Note shall be made in lawful money of the United States of America in immediately available funds. In the event that any payment under this Note by check or preauthorized charge is later dishonored or returned to Lender unpaid due to nonsufficient funds, Borrower agrees to pay Lender an additional NSF check charge equal to $150.00.

The unenforceability or invalidity of any provision of this Promissory Note shall not affect the enforceability or validity of any other provision herein, and the invalidity or unenforceability of any provision of this Promissory Note as to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

This Promissory Note has been executed and delivered in Hong Kong and shall be construed in accordance with the applicable laws of the Hong Kong. Borrower hereby consents and agrees that any action arising out of or in connection with this Note or any endorsement or guaranty of this Note or any other Loan Document or any matter relating thereto shall be brought only in a court of competent jurisdiction Hong Kong, which courts shall have exclusive jurisdiction and venue over any and all actions; and Borrower, Borrower's assigns and successors-in-interest hereby consent to and confer personal jurisdiction over themselves by the Courts of Hong Kong for any and all said actions, by personal service or process upon themselves or their agents or representatives in accordance with the laws of Hong Kong.

Each party hereto hereby irrevocably waives, to the fullest extent not prohibited by applicable governmental requirement, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this note or any other loan document or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other person has represented, expressly or otherwise, that such other person would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this note and the other loan documents by, among other things, the mutual waivers and certifications in this section.

This Promissory Note, together with all other loan documents, represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties. The provisions of this Promissory Note may not be waived or modified except in writing, signed by Lender.

5. Costs of Enforcement. In the event it becomes necessary for the Lender to retain legal counsel for the enforcement of this Promissory Note or any of its terms, Borrower promises and agrees to pay, on demand, all costs and expenses of such enforcement, including reasonable attorneys' fees incurred by the Lender, whether or not suit is filed.

6. Assignment. Borrower shall have no right to assign its obligations under this Promissory Note without the Lender's prior written consent, which consent may be withheld in Lender's sole and absolute discretion. The Lender shall have the right to assign all or any portion of its interest in this Promissory Note at any time.

7. Binding Effect. The terms of this Promissory Note shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, legatees, devisees, administrators, executors, personal representatives, successors and assigns. As used herein, the term "Borrower" shall include the undersigned Borrower and any other person or entity that may subsequently become liable for the payment hereof. The term "Lender" shall include the Lender as well as any other person or entity to which this Promissory Note or any interest in this Promissory Note is conveyed, transferred or assigned with Borrower's written consent.

8. Surrender of Note. When the entire indebtedness evidenced by this Promissory Note is repaid to the Lender in full the original of this Promissory Note shall be surrendered by the Lender to Borrower for cancellation.

9. Amendment. This Promissory Note may not be changed, altered, amended, or modified unless by a written instrument signed by the parties hereto.

Executed by the undersigned and effective as of **21 November, 2019**.

Silver Screen Finance Inc.

By:
Its:

Remington William Chase

By:
Its:

# EXHIBIT 3

Alerts 0      Approvals 0

## PREVIEW INTERNATIONAL WIRE PAYMENT

 Help

---

### PAYMENT INFORMATION

Required Fields ⊖

**Debit Account**

███████ - SILVER SCREEN - USD

**Amount**

USD 550,000.00

**Amount Type**

Debit

**Recipient**

Production Capital LLC
206179373
3507 JACK NORTHROP AVE
HAWTHORNE CA 90250

**Bank**

JPMORGAN CHASE BANK, N.A.
SWIFT (International) CHASUS33
383 MADISON AVENUE
NEW YORK UNITED STATES

**Recipient Currency**

USD

## ADDITIONAL INFORMATION

⊖

**Details of Payment**

Routing 322271627

**Charges**

Ours

**Approve on Submit**

Yes

**PAYMENT DATE**

Alerts   0      Approvals   0   

Value Date

09/29/2021

Send Date

09/29/2021

Frequency

One-Time Only

## Successful Submit

Payment 4ZU6C4PZT0 has been successfully created. Total amount USD 550,000.00.

Save as Template          Create Another          Payment Center

**DISCLAIMER: International Wire – All EWB Account to account transfers (different currency)**
**HK local RTGS (same & different currency)**
**International wire (same & different currency)**
**Note:**
If you do FX transaction for your own account(s) or sending the money
to other East West Bank Hong Kong Branch's account,
ONLY matching Recipient Account Number and Account Currency will be successfully processed

**HKD/CNH Remittance to overseas**
Intermediate bank should be provided. Without providing intermediate bank information may result in payment delay or possible rejection
of payment. Related charges will be imposed.

**International wire cutoff time** is 16:00 HKT

︿
BACK TO TOP



Alerts   0        Approvals   0

Phone
+852.2218.9010

Email
CustomerCareHK@eastwestbank.com

Routing Number
EWBKHKHH

## Quick Links

Training Center (https://www.eastwestbank.com/en/HK-training-center)

businessBridge China (https://bridge.eastwestbank.com.cn/corporbank/index.do)

EWB HK Home Page (https://bridge.eastwestbank.com.hk/gtp)

## East West Bank

www.eastwestbank.com (https://www.eastwestbank.com/)

Online Banking Fraud Protection (https://www.eastwestbank.com/locator/privacy-and-security/online-banking-fraud-protection)

Privacy and Security (https://www.eastwestbank.com/en/privacy-and-security/)

Report Fraud, Phishing and Email Scams (https://www.eastwestbank.com/en/privacy-and-security/report-fraud-phishing-and-email-scams)

### Connect With Us

://www.facebook.com/eastwestbank.us)    (https://www.linkedin.com/company/east-west-bank)    (https://www.youtube.com/user/eastwest

© 2021 East West Bank. All Rights Reserved.



## CAPITAL ADVANCE AGREEMENT

This Capital Advance Agreement (the "Agreement") is entered into by and between Production Capital LLC (the "Company"), with an address of 3507 Jack Northrop Ave, Hawthorne, CA, 90250, on the one hand, and the **[Silver Screen]** (the "Capital Provider"), on the other, as of **September 21, 2021**.

WHEREAS, the Company has been asked to make capital available to Production Capital (or one of its affiliates or designees) to be utilized in connection with providing bridge loan and the like financing for production (or otherwise in connection with the funding of certain off budget obligations) (hereinafter referred to as the "Short Duration Loan") in connection with the slate of pictures for Production Capiatl.

WHEREAS, the Company wishes to raise monies from individuals for the purpose of making capital available for such Short Duration Loans; and

WHEREAS, the Capital Provider wishes to advance capital to the Company for the purpose of making capital available for such Short Duration Loan, in exchange for financial consideration on such capital advance;

NOW, THEREFORE, in consideration of the mutual benefits inuring to the Company and the Capital Provider, and other good for and for valuable consideration, the receipt, adequacy and legal sufficiency of which both the Company and the Capital Provider hereby acknowledge, IT IS HEREBY AGREED AS FOLLOWS:

THE ADVANCE

1.      On or before September 21, 2021, the Capital Provider agrees to advance to the Company the sum of **[Five Hundred and Fifty] Thousand Dollars ($550,000.00)** (the "Advance") via wire transfer, as set forth in Paragraph 18 below.  If the Capital Provider fails to make the Advance as set forth herein, the terms of this Agreement are automatically deemed null and void, and neither the Company nor the Capital Provider shall have any further rights or obligations hereunder.

THE PREMIUM

2.      The Company has an obligation to repay the Capital Provider both the Advance and a premium thereon in an amount equal to **[Five] Percent ([5]%)** of the Advance (the "Premium") on or before six months of the date of execution. The amount to be repaid for the Advance and Premium shall be referred to as the "Repayment Amount."

LOGISTICS OF REPAYMENT AMOUNT

3.      All costs and expenses associated with wiring the Advance shall be borne by the Capital Provider.  All costs and expenses associated with wiring the Repayment Amount, if in an amount in excess of Fifty Thousand Dollars ($50,000), shall be borne by the Company.

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

4.      The Company hereby represents and warrants to the Capital Provider as follows: (a) the Company is duly authorized to enter into this Agreement, to grant the rights herein granted and to perform all its obligations hereunder; (b) this Agreement constitutes the legal, valid and binding agreement and obligation of the Company, enforceable against the Company in accordance with its terms; and (c) the execution and performance of this Agreement are not in conflict with any law or any indenture, agreement or undertaking to which the Company is a party or by which the Company is bound or affected.

5.      The Company agrees, until full and final payment of all sums outstanding under this Agreement, the Company will promptly give oral or written notice to the Capital Provider of: (a) all litigation affecting the Company where the amount of damages being sought exceeds Ten Thousand Dollars ($10,000); and (b) any other matter which has resulted or might result in a material adverse change in the Company's financial condition.

SECURITY/COLLATERAL

6.      The ultimate Short Duration Loan lender for the Picture – whether it is 1 Divided Films and/or one of its affiliates, designees or partners, or a separate party – has the right to acquire certain collateral in the Picture, which may include, by way of example, a security interest in and to the right, title and interest (including copyrights) in and to the story, the screenplay (including drafts, prior versions and variations thereof) and/or other musical, dramatic and/or literary material, upon which, in whole or in part, the Picture is or may be based, or from which the Picture is or may be adapted or inspired, or which otherwise may be or has been used or included in the Picture, including, by way of example, scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts and/or other like properties or materials (the "Collateral").

7.      To the extent the ultimate Short Duration Loan lender for the Picture – whether it is Production Capital and/or one of its affiliates, designees or partners, or a separate party – has acquired Collateral in the Picture, the Company, and its Capital Providers hereunder, shall enjoy the benefit of such Collateral, on a pro-rata basis.

<u>LIMITATIONS ON LIABILITY/RIGHTS</u>

8.      The Capital Provider shall have no rights as against the Picture, its producers, or 1 Divided Films (or its affiliates or designees), should the Company fail to satisfy any of its obligations under this Agreement.  This provision shall not constitute a waiver of any other rights the Capital Provider may have, if any, in law or in equity, against any party, including any party named in this provision.  In addition, the Company has a fiduciary duty, and shall make its best efforts, to satisfy its obligations under this Agreement, including, without limitation, to seek monies from the producers of the Picture (or 1 Divided Films) to satisfy the Repayment Amount.

<u>FURTHER DISCLOSURES</u>

9.      The Capital Provider hereby acknowledges that the Company is pooling capital advances from other capital providers in order to fund the Short Duration Loan being provided for the Picture.

<u>MISCELLANEOUS</u>

10.      This Agreement and the rights and obligations of the Company and the Capital Provider hereunder shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any conflict of law provision.

11.      The Company and the Capital Provider hereby irrevocably submit to the sole and exclusive jurisdiction of the state and local courts located in the Delaware if any dispute arises under this Agreement.

12.      THE COMPANY AND THE CAPITAL PROVIDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE UNDERLYING TRANSACTIONS.

13.      If any provision of this Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, such provision shall be enforced to the maximum extent permitted by law and the remaining provisions shall remain in full force and effect.

14.      The terms of this Agreement shall constitute the integrated agreement as between the Company and the Capital Provider as to the subject matter of this Agreement, including, without limitation, the Advance, the Premium and the Repayment Amount.  This Agreement supersedes all previous negotiations and discussions between the parties with respect to the matters stated herein, and no parol evidence of any prior or other agreement shall be permitted to contradict or vary the terms hereof.

15.     Capital Provider represents and warrants that he/she/it/they has/have had the opportunity to consult with legal counsel of his/her/its/their choice, are fully aware of the terms contained in this Agreement and has/have voluntarily and without coercion or duress of any kind, entered into this Agreement and the documents executed in connection with this Agreement, if applicable, and have not entered into this Agreement in reliance upon any inducement or promise by the Company not contained herein.

16.     No termination, waiver, modification or amendment to this Agreement shall be binding unless in writing and signed by the Company and the Capital Provider.

17.     The failure of either the Company or the Capital Provider to take action as a result of a breach of this Agreement by the other shall constitute neither a waiver of any particular right related to such breach nor a waiver of either's right to enforce any provision of this Agreement through any remedy granted by law or this Agreement.

18.     No consent or waiver under this Agreement shall be effective unless in writing.  No waiver of any breach or default shall be deemed a waiver of any breach or default thereafter occurring.  No reliance upon or waiver of one or more provisions of this Agreement shall constitute a waiver of any other provisions hereof.

19.     This Agreement shall bind and inure to the benefit of the Company and the Capital Provider and each of its/his/her/their respective heirs, personal representatives, successors and assigns; provided, however, that the Company shall not assign this Agreement or any of the rights, duties or obligations of the Company without the prior written consent of the Capital Provider, such consent not to be unreasonably withheld.

## WIRE TRANSFER INFORMATION

20.     The Advance, other than a prior Credit (defined below), shall be made by wire transfer, as follows:

Account Name:     Production Capital, LLC
Bank Name:        Chase Bank
Bank Address:     888 W 6th ST., Los Angeles, Ca 90017
ABA Routing:      021000021
Account No.:      ███████
SWIFT Code:       CHASUS33

The address for Production Capital LLC is 3507 Jack Northrop Ave, Hawthorne Ca 90250.

21.     This Agreement may be executed and delivered in counterparts, including by PDF e-mail, each of which shall be deemed to be an enforceable original and all of which together shall constitute one enforceable instrument.

IN WITNESS WHEREOF, the Company and the Capital Provider have duly executed and delivered this Agreement as of the date first above written.

As for the Company:
Production Capital LLC

Name:  Kevin Robl
Title:   Chief Executive Officer


As for the Capital Provider:

Julus Wang, CEO

Name:  Silver Screen

# **EXHIBIT** 4

*ASSIGNMENT AND ASSUMPTION AGREEMENT*

*This Assignment and Assumption Agreement (this "Assignment") is made as of December 19, 2021 by and between Silver Screen Films Inc. which was previously known as Silver Screen Finance Inc. ("Lender") and Hollywood Media Venture LLC ("HMV") with reference to the following.*

*WHEREAS, prior to the date hereof, Lender and 10-13 Productions, Inc. ("10-13"), entered into that certain document entitled "Agreement for Financing" dated as of September 2, 2019 (the "Loan Agreement") concerning Lender's loan to 10-13 of $3,100,000 ("Loan") for the production of a motion picture entitled "10-13" (the "Picture"); and*

*WHEREAS, HMV has expressed a desire to purchase from Lender all of Lender's rights as set forth in the Loan Agreement and has agreed to assume any obligations of Lender under the Loan Agreement; and*

*WHEREAS, Lender has agreed to assign all of its rights and obligations under the Loan Agreement to HMV as set forth herein.*

*NOW, THEREFORE, it is hereby agreed as follows:*

1. *Assignment. Lender hereby assigns to HMV all of Lender's rights and obligations under the Loan Agreement ("Lender's Rights"). As such, upon full execution of this Assignment, all of Lender's Rights shall be assigned to and vested in HMV and all references to Lender in the Loan Agreement shall mean HMV and HMV shall have all rights to enforce any and all of the rights of the Lender as the successor in interest to Lender. In consideration for the transfer of the Lender's Rights, HMV will pay Lender the sum equal to the Loan plus an interest at an annual rate of 15% of the Loan for a total payment of $4,019,925("HMV Payment"). The HMV Payment must be fully paid to Lender within **ten (10)** days after HMV receives a fully executed copy of this Agreement.*

2. *Acceptance. HMV does hereby accept the assignment of the rights set forth in section 1 and the responsibility to perform all obligations of Lender as set forth in the Lender Agreement.*

3. *Warranties and Representations. Lender hereby represents, warrants and agrees that: Lender is the sole and exclusive owner of all of the rights under the Loan Agreement transferred to HMV; Lender has the full and sole right and authority to enter into this Agreement and to convey the rights herein conveyed to HMV as herein set forth; none of Lender's rights under the Loan Agreement have in any way been encumbered, conveyed, granted or otherwise disposed of and are free of any liens or claims whatsoever; and there are no claims or litigation pending, outstanding or threatened which will prejudice, interrupt or materially interfere with HMV's right to the benefits transferred. The foregoing warranties and representations are made by Lender to induce HMV to execute this Agreement and Lender acknowledges that HMV has*

*1*

*executed this Agreement in reliance thereon. Lender hereby agrees to indemnify and hold harmless HMV and its agents, employees, successors, licensees and assigns, from and against any third-party claim, demand, loss, obligation, liability, cost or expense (including reasonable outside attorney's fees and court costs, whether or not litigation is actually commenced) arising out of a material breach by Lender of any warranties, representations or agreements contained in this Agreement.*

*    **4.**    <u>Miscellaneous</u>. This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and that all of which taken together shall constitute one and the same instrument, respectively. Delivery of an executed counterpart of this Assignment by facsimile or electronic mail shall be equally effective as delivery of a manually executed counterpart of this Assignment. Any party delivering an executed counterpart by facsimile or electronically shall also deliver a manually executed counterpart of this Assignment, but failure to do so shall not effect the validity, enforceability, of binding effect of this Assignment. All parties hereby acknowledge and agree that any legal proceedings arising out of or related in any way to this Assignment, the Agreement, or any of the transactions contemplated thereby shall be subject to the arbitration provisions set forth under the Agreement.*

*[signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment to be executed and delivered as of the date first above written.

*Hollywood Media Venture LLC*

By:_____

Print Name:_____Kevin Robl_____

Title:_____

*Silver Screen Films Inc.*

By:_____

Print Name:___Julius Wang_____

Title:_____

# EXHIBIT 5

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "*Assignment*") is made as of December 19, 2021 by and between Silver Screen Films Inc. which was previously known as Silver Screen Finance Inc.("Lender") and Hollywood Media Venture ("HMV") with reference to the following.

WHEREAS, prior to the date hereof, Lender and William Chase ("Chase"), entered into that certain document entitled "Agreement for Financing" dated as of November 21, 2019 (the "Loan Agreement") concerning Lender's loan to Chase of $700,000 ("Loan") for the production of a motion picture (the "Picture"); and

WHEREAS, HMV has expressed a desire to purchase from Lender all of Lender's rights as set forth in the Loan Agreement and has agreed to assume any obligations of Lender under the Loan Agreement; and

WHEREAS, Lender has agreed to assign all of its rights and obligations under the Loan Agreement to HMV as set forth herein.

NOW, THEREFORE, it is hereby agreed as follows:

1.    *Assignment*. Lender hereby assigns to HMV all of Lender's rights and obligations under the Loan Agreement ("Lender's Rights"). As such, upon full execution of this Assignment, all of Lender's Rights shall be assigned to and vested in HMV and all references to Lender in the Loan Agreement shall mean HMV and HMV shall have all rights to enforce any and all of the rights of the Lender as the successor in interest to Lender. In consideration for the transfer of the Lender's Rights, HMV will pay Lender the sum equal to the Loan plus an interest at an annual rate of 15% of the Loan for a total payment of $1,010,625 ("HMV Payment"). The HMV Payment must be fully paid to Lender within ten (10) days after HMV receives a fully executed copy of this Agreement.

2.    *Acceptance*. HMV does hereby accept the assignment of the rights set forth in section 1 and the responsibility to perform all obligations of Lender as set forth in the Lender Agreement.

3.    *Warranties and Representations*. Lender hereby represents, warrants and agrees that: Lender is the sole and exclusive owner of all of the rights under the Loan Agreement transferred to HMV; Lender has the full and sole right and authority to enter into this Agreement and to convey the rights herein conveyed to HMV as herein set forth; none of Lender's rights under the Loan Agreement have in any way been encumbered, conveyed, granted or otherwise disposed of and are free of any liens or claims whatsoever; and there are no claims or litigation pending, outstanding or threatened which will prejudice, interrupt or materially interfere with HMV's right to the benefits transferred. The foregoing warranties and representations are made by Lender to induce HMV to execute this Agreement and Lender acknowledges that HMV has

*1*

*executed this Agreement in reliance thereon. Lender hereby agrees to indemnify and hold harmless HMV and its agents, employees, successors, licensees and assigns, from and against any third-party claim, demand, loss, obligation, liability, cost or expense (including reasonable outside attorney's fees and court costs, whether or not litigation is actually commenced) arising out of a material breach by Lender of any warranties, representations or agreements contained in this Agreement.*

4. <u>*Miscellaneous*</u>*. This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and that all of which taken together shall constitute one and the same instrument, respectively. Delivery of an executed counterpart of this Assignment by facsimile or electronic mail shall be equally effective as delivery of a manually executed counterpart of this Assignment. Any party delivering an executed counterpart by facsimile or electronically shall also deliver a manually executed counterpart of this Assignment, but failure to do so shall not effect the validity, enforceability, of binding effect of this Assignment. All parties hereby acknowledge and agree that any legal proceedings arising out of or related in any way to this Assignment, the Agreement, or any of the transactions contemplated thereby shall be subject to the arbitration provisions set forth under the Agreement.*

*[signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment to be executed and delivered as of the date first above written.

*Hollywood Media Venture LLC*

By:_____

Print Name:_____Kevin Robl_____

Title:_____

*Silver Screen Films Inc.*

By:_____

Print Name:\_\_\_Julius Wang_____

Title:_____

# EXHIBIT 6

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "*Assignment*") is made as of December 19, 2021 by and between Silver Screen Films Inc. which was previously known as Silver Screen Finance Inc.("Lender") and Hollywood Media Ventures  ("HMV") with reference to the following.

WHEREAS, prior to the date hereof, Lender and Production Capital LLC ("Production Capital"), entered into that certain document entitled "Capital Advance Agreement" dated as of September 23, 2021 (the "Loan Agreement") concerning Lender's loan to Production Capital of
$550,000 ("Loan") for the production of a motion picture (the "Picture"); and

WHEREAS, HMV has expressed a desire to purchase from Lender all of Lender's rights as set forth in the Loan Agreement and has agreed to assume any obligations of Lender under the Loan Agreement; and

WHEREAS, Lender has agreed to assign all of its rights and obligations under the Loan Agreement to HMV as set forth herein.

NOW, THEREFORE, it is hereby agreed as follows:

1.   *Assignment*. Lender hereby assigns to HMV all of Lender's rights and obligations under the Loan Agreement ("Lender's Rights"). As such, upon full execution  of this Assignment, all of Lender's Rights shall be assigned to and vested in HMV and all references to Lender in the Loan Agreement shall mean HMV and HMV shall have all rights to enforce any and all of the rights of the Lender as the successor in interest to Lender. In consideration for the transfer of the Lender's Rights, HMV will pay Lender the sum equal to the Loan plus a flat premium equal to 5% of the Loan for a total payment of $577,500 ("HMV Payment"). The HMV Payment must be fully paid to Lender within ten (10) days after HMV receives a fully executed copy of this Agreement.

2.   *Acceptance*. HMV does hereby accept the assignment of the rights set forth in section 1 and the responsibility to perform all obligations of Lender as set forth in the Lender Agreement.

3.   *Warranties and Representations*. Lender hereby represents, warrants and agrees that: Lender is the sole and exclusive owner of all of the rights under the Loan Agreement transferred to HMV; Lender has the full and sole right and authority to enter into this Agreement and to convey the rights herein conveyed to HMV as herein set forth; none of Lender's rights under the Loan Agreement have in any way been encumbered, conveyed, granted or otherwise disposed of and are free of any liens or claims whatsoever; and there are no claims or litigation pending, outstanding or threatened which will prejudice, interrupt or materially interfere with HMV's right to the benefits transferred. The foregoing warranties and representations are made by Lender to induce HMV to execute this Agreement and Lender acknowledges that HMV has

*1*

*executed this Agreement in reliance thereon. Lender hereby agrees to indemnify and hold harmless HMV and its agents, employees, successors, licensees and assigns, from and against any third-party claim, demand, loss, obligation, liability, cost or expense (including reasonable outside attorney's fees and court costs, whether or not litigation is actually commenced) arising out of a material breach by Lender of any warranties, representations or agreements contained in this Agreement.*

*4.     Miscellaneous. This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and that all of which taken together shall constitute one and the same instrument, respectively. Delivery of an executed counterpart of this Assignment by facsimile or electronic mail shall be equally effective as delivery of a manually executed counterpart of this Assignment. Any party delivering an executed counterpart by facsimile or electronically shall also deliver a manually executed counterpart of this Assignment, but failure to do so shall not effect the validity, enforceability, of binding effect of this Assignment. All parties hereby acknowledge and agree that any legal proceedings arising out of or related in any way to this Assignment, the Agreement, or any of the transactions contemplated thereby shall be subject to the arbitration provisions set forth under the Agreement.*

*[signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment to be executed and delivered as of the date first above written.

*Hollywood Media Venture LLC*

By:_____

Print Name: _____*Kevin Robl*_____

Title:_____

*Silver Screen Films Inc.*

By:_____

Print Name: ____Julius Wang____

Title: _____